**STATE of Missouri, Respondent,**

v.

**Alexander H. SAMUELS, Appellant.**

**No. WD 58572.**

Missouri Court of Appeals, Western District.

Aug. 27, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 2002.

Application for Transfer Denied Nov. 26, 2002.

Jeremiah W. (Jay) Nixon, Attorney General, Breck K. Burgess, Assistant Attorney General, Jefferson City, MO, for respondent.

Andrew A. Schroeder, Assistant Appellate Defender, Kansas City, MO, for appellant.

Before HOWARD, P.J., TURNAGE, Sr. J., and HANNA, Sr. J.

VICTOR C. HOWARD, Presiding Judge.

Alexander Samuels appeals from his convictions of three counts of statutory rape in the first degree, § 566.032,[1] four counts of statutory sodomy in the first degree, § 566.062, and one count of statutory rape in the second degree, § 566.034. Samuels' sole point on appeal is that the trial court erred in sustaining the State's motion in limine and precluding him from presenting evidence that the victims, A.S. and A.B., alleged that men other than him had sexually abused them.

We affirm in part, reverse in part, and remand for a new trial in accordance with this opinion.

### Facts

The following is a brief summary of the facts. The facts will be further discussed as warranted by the points on appeal.

This case involves the alleged sexual abuse of N.W., age 14, A.S., age 9, and A.B., age 6. A.S. and A.B. were Samuels' children. The evidence indicates that their mother had either lost custody or abandoned the children and was not present in the home. N.W. knew appellant because appellant used to date her sister. She moved into Samuels' residence because her mother could not care for her and she had nowhere else to go.

On March 10, 1998, DFS received a hot line call alleging that children were living in a dirty house with no food in the home. N.W., A.S., A.B., and three other children were living in the house, which was located at 59th and Troost in Kansas City, Missouri. After investigation, DFS placed five of the children in the home in the Salvation Army Children's Shelter, while the youngest child was placed in a foster home. N.W. went to live with her mother temporarily.

While A.S. was in the shelter, she disclosed the sexual abuse that Samuels had committed against her, and a second hot line call was made to DFS concerning the alleged abuse. Katherine Cole, a social worker with DFS, took A.S. to the emergency room because A.S. had stated that she had a yellowish-green discharge from her anus. A.S. made extensive disclosures to Cole about the sexual abuse Samuels committed against her.

---

1. All statutory references are to RSMo 2000.

On March 23, 1998, A.S. went to Children's Mercy Hospital for an examination. The examination revealed that A.S.'s whole vaginal area was red and inflamed and bled very easily, her hymen was thickened and had rolled edges, and her urethra gaped open.

On March 24, 1998, another social worker, Kristin Fowler, talked to N.W. and A.B. A.B. disclosed that Samuels had sexually abused her. N.W. had initially denied that Samuels had sexually abused her. A month later, however, after N.W.'s mother had kicked her out of the house, she called Fowler back and told her that she had had sexual intercourse with Samuels. On March 27, 1998, A.B. also disclosed to Cole that her father had sexually abused her.

On March 30, 1998, Cole took A.S. to the Child Protection Center ("CPC") at Children's Mercy Hospital, where social worker Julie Donelon interviewed A.S., and A.S. made a videotaped statement concerning Samuels' abuse of her.

On April 17, 1998, Cole took A.B. to the CPC, and on the way A.B. again disclosed that Samuels had sexually abused her. Donelon interviewed A.B. at the CPC, and the interview was videotaped. Dr. Katherine Smith examined A.B. that same day. Dr. Smith observed that A.B.'s genitalia appeared normal, and Dr. Smith believed that if A.B. had experienced penile penetration, it was not deep enough to extend through the hymenal opening, which was undisturbed.

On May 15, 1998, Dr. Smith examined N.W. The examination revealed that she had an interruption of the hymen. This was consistent with sexual contact. However, N.W. admitted to having sex with a person other than Samuels in October 1997.

A.S. subsequently disclosed to her counselor, Judith Anderson, that Samuels had sexually abused her. A.B. also disclosed to her counselor, Deborah Rinehart, that Samuels had sexually abused her.

Samuels was arrested on September 9, 1998. The next day, Officer Brad Dumit of the Kansas City Police Department asked Samuels if he was aware of why he was under arrest. Samuels said that he was under arrest because he had been accused of raping his children. Officer Dumit informed Samuels of his Miranda rights. Samuels signed a written waiver of those rights and indicated that he wanted to speak to Officer Dumit.

Samuels initially said that he had not done anything wrong and that he did not have anything to hide. He said that the children were probably mad at him because he was strict. Later in the interview, though, he said that he suffered from blackouts and that he sometimes did not remember what he did. Several times during the interview, Samuels broke down and cried and said that he needed to see a therapist if he molested his children or anyone else. He said that he wanted to find out if he had done anything to the children. He said, "I'm not going to deny doing anything sexual to those kids, but I'm also not going to admit it."

Samuels was charged with statutory rape in the first degree involving A.S. (Count I), statutory sodomy in the first degree involving A.S. (Count II), statutory sodomy in the first degree involving A.S. (Count III), statutory rape in the first degree involving A.S. (Count IV), statutory sodomy in the first degree involving A.S. (Count V), statutory sodomy in the first degree involving A.S. (Count VI), statutory rape in the first degree involving A.B. (Count VII), and statutory rape in the second degree involving N.W. (Count VIII).

At trial, N.W. testified that she moved into Samuels' house at 59th and Troost on November 5, 1997. Shortly after moving in, she and Samuels began having sexual intercourse at least twice a week.

A.S. testified at trial that she had put her mouth on Samuels' "front part" after Samuels told her to do so, and that Samuels would then "go pee" and that something would come out in her mouth and she would spit it out. She further testified that Samuels touched the inside of her behind with his "front part" and that Samuels told her that he would kill her if she told anybody. A.S. testified that Samuels would go "up and down" and put grease on his "private." She further testified that Samuels put his "front part" inside her "front part" and that this happened "a lot."

A.B.'s testimony was presented to the jury by way of a videotaped deposition. A.B. testified that Samuels touched the inside of her "private" with his hand and that Samuels put his "private" inside her "private."

Samuels did not testify on his own behalf or call any witnesses. At the close of the evidence, instructions and argument of counsel, the jury found that Samuels was guilty as charged. After finding Samuels to be a prior offender, the trial court sentenced Samuels to 25 years for Count I of statutory rape in the first degree, 25 years for Count II of statutory sodomy in the first degree, 25 years for Count III of statutory sodomy in the first degree, 25 years for Count IV of statutory rape in the first degree, 25 years for Count V of statutory sodomy in the first degree, 25 years for Count VI of statutory sodomy in the first degree, 30 years for Count VII of statutory rape in the first degree, and 7 years for Count VIII of statutory rape in the second degree. The court ordered the sentences for Counts I through VI to run concurrently with each other and the sentences for Counts VII and VIII to run consecutively with each other and consecutively with the sentences in Counts I through VI. This appeal follows.

## Standard of Review

The standard of review was set forth in *State v. Sales*, 58 S.W.3d 554, 558 (Mo.App. W.D.2001), as follows:

A trial court has broad discretion in deciding whether to admit or exclude evidence at trial. We will not disturb the trial court's ruling unless we find that it clearly abused its discretion. And we will only find a trial court to have clearly abused its discretion when a ruling is "clearly against the logic and circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration."

(Citations omitted.)

## Argument

Samuels' sole point on appeal is that the trial court erred in sustaining the State's motion in limine, which precluded him from presenting evidence that A.S. and A.B. alleged that men other than him had raped them.[2] Samuels intended to elicit this testimony through cross-examination of Katherine Cole and Julie Donelon and through his presentation of Christina Odell's testimony. Samuels contends that A.S.'s statements to Cole, Donelon, and Odell were relevant to show both an alternative source of vaginal abnormality and an alternative source of knowledge of adult sexual acts. Samuels contends that A.B.'s statements to Cole and Donelon were relevant to show an alternative source of

---

**2.** Count VIII relates to N.W. The court permitted evidence of N.W.'s sexual contact with

another man, and Samuels does not challenge his conviction on Count VIII.

knowledge of adult sexual acts. Samuels contends that all of the statements were relevant to show the girls' motive to lie. Samuels contends that he suffered prejudice because a possible motive to lie was kept from the jury and because the State was allowed to attribute A.S.'s vaginal abnormalities and both girls' "unusual" knowledge of adult sexual acts solely to him, but he was not in turn allowed to attribute the abnormalities and unusual familiarities to the men whom the defense believed were entirely responsible for the crimes.

On February 25, 2000, the State filed a "motion in limine to exclude evidence of knowledge of sexual matters and other allegations of sexual abuse." The State cited *State v. Harvey*, 641 S.W.2d 792 (Mo. App. W.D.1982), *State v. Lampley*, 859 S.W.2d 909 (Mo.App. E.D.1993), and *State v. Sloan*, 912 S.W.2d 592 (Mo.App. E.D. 1995), to support its argument that a victim's prior awareness of sexual matters is not admissible to show an alternative source of sexual knowledge. The State argued that the evidence of prior sexual contact by Samuels upon A.S. did not fall within any exception to § 491.015.

Defense counsel argued that the evidence of prior sexual contact was relevant and admissible 1) to reveal the alleged victims' bias and motive to fabricate; 2) as "an alternative source" of the "evidence of physical abuse"; 3) as an "alternative explanation to the source of terminology these kids have learned"; and 4) as "evidence of immediate surrounding circumstances."

The trial court sustained the State's motion in limine.

During both Cole's and Donelon's testimony, defense counsel renewed his objection to the trial court's ruling precluding him from eliciting on cross-examination that A.S. and A.B. stated that other men had had sex with them. The trial court overruled the objections. The trial court admitted, over defense counsel's objections, State's Exhibits 3 and 4, videotaped statements of A.S. and A.B. The statements were edited, over defense counsel's objection, to remove all statements concerning allegations of sexual contact by persons other than Samuels, and were then played for the jury.

At the conclusion of the State's evidence, the trial court overruled defense counsel's motion for judgment of acquittal. Defense counsel then made the following offer of proof with respect to the evidence that Samuels wanted to present concerning prior sexual contacts by other men. Christina Odell, a former girlfriend of Samuels, used to live with the family and knew both A.S. and A.B. She recalled that A.S. had told her on the day that Samuels was arrested that Dennis Norris "touched her privates and stuff" and that her Uncle Joe "raped her." Odell recalled that A.S. reported that her "privates" were bleeding after Norris touched her.

In addition to the foregoing offer of proof, the trial court received evidence outside the hearing of the jury of other statements made by both A.S. and A.B. concerning prior sexual contacts by men other than Samuels, including 1) A.S. told Katherine Cole that she had also had sex with her Uncle Joe; 2) A.B. told Julie Donelon that she had been sexually abused by her uncle, Joseph Samuels (or Joseph Mattic); and 3) A.B. told both Cole and Donelon that she had been sexually abused by her uncle, Joseph Samuels (or Joseph Mattic), as well as by her grandfather.

At the conclusion of the offer of proof, the trial court ruled, over defense counsel's objection, that the evidence of prior sexual abuse by men other than Samuels was inadmissible.

Samuels' first argument on appeal is that A.S.'s statements that Uncle Joe "raped her" and that Norris "touched her privates and stuff" were relevant and admissible to show an alternative source of A.S.'s vaginal abnormalities.

During the State's case, the State presented the testimony of Dr. Mary Hegenbarth. Dr. Hegenbarth made three observations that she considered to be both abnormal and consistent with A.S. having been sexually abused. The abnormalities included 1) A.S.'s entire vaginal area was red, inflamed, and bled very easily; 2) A.S.'s hymen appeared to be thickened or to have rolled edges; and 3) A.S.'s urethra "kind of gaped wide open." The abnormalities were of "nonspecific" origin, meaning that they were not necessarily caused by sexual abuse. The first abnormality could have been the result of vaginitis or "extreme hygiene problems," and the second and third conditions sometimes appear in young girls' bodies normally.

The State agrees with Samuels that this case needs to be reversed and remanded for a new trial as to Samuels' convictions in Counts I and IV because of the exclusion of the evidence that A.S. had sex with persons other than Samuels. The State concedes that it opened the door to the admission of that evidence as to Counts I and IV, which involved convictions for Samuels committing statutory rape against A.S. The trial court allowed the State to present medical evidence that suggested that A.S., who was nine years old at the time of the examination, had engaged in conduct consistent with sexual abuse involving penetration of her vagina. Samuels was not permitted to present evidence showing another source of that condition. Further, the State emphasized in its argument the compelling nature of this evidence.

However, the State contends it did not open the door to the admission of this evidence as to the other counts because those counts did not involve vaginal penetration, or the State did not present evidence in those counts that showed that the children had been vaginally penetrated and then exclude evidence of a source, other than Samuels, of the penetration. The other counts pertaining to A.S. were sodomy counts, and there was no medical evidence that she placed her mouth on Samuels' penis or that he placed his penis in her anus. Similarly, A.B.'s medical examination did not include any findings of sexual abuse.

In *State v. Douglas*, 797 S.W.2d 532 (Mo.App. W.D.1990), the defendant was convicted of sexual assault, rape, sodomy and child abuse. On appeal, the defendant claimed that the trial court erred in refusing, on the basis of § 491.015, to allow him to cross-examine one of the complaining witnesses with respect to sexual activity with someone other than the defendant. *Douglas*, 797 S.W.2d at 534. The physician who examined the witness testified that the absence of the girl's hymenal tissue would not be a usual finding on an individual who had not engaged in sexual intercourse, and that her observations of the girl were consistent with penile penetration of the vagina. *Id.* The court concluded that the intended inference of the physician's testimony was that the absence of the hymen was caused by intercourse with the defendant, and that the defendant's right to a fair trial was violated when he was not allowed to counter the inference by showing that other sexual activity could have accounted for the absence of the hymen. *Id.* at 534, 536.

■ We find no distinction between *Douglas* and the present case. In both cases, the intended inference of the physician's testimony was that the victim's physical condition was caused by inter-

course with the defendant. As in *Douglas*, we find that Samuels' right to a fair trial was violated when he was not allowed to counter the inference by showing that other sexual activity could have accounted for A.S.'s physical condition. We agree that Samuels' convictions on Counts I and IV should be reversed and remanded for a new trial. Samuels' convictions on the other counts are discussed below.

Samuels' second argument is that A.S.'s statements that her Uncle Joe "raped her" and that Norris had "touched her privates and stuff" and A.B.'s statements that both Uncle Joe and her grandfather had sexually abused her were relevant and admissible to show an alternative source of knowledge of adult sexual acts.

Specifically, in its opening statement, the State told the jury that Judith Anderson would testify that A.S.'s ability "to draw some explicit genitalia and explicitly state what they are" is "unusual" for a child who is nine years old. Ms. Anderson did in fact give that testimony. Then, in its closing argument, the State commented as follows:

> When you're talking to little girls who are six years old, nine years old, and 14 years old and you talk to them about what's going on in their lives, you [don't] expect to hear things like: ... their dad peeing in their mouth. These girls are talking about yellow stuff coming out of their dad's penis. These girls are talking about a squeaky little thing that dad pulls out of a silver package and puts on his penis. These girls are talking about their father putting his penis in their butt and their vagina. Weren't we all shifting in our chairs and squirming with discomfort when we heard these things coming out of these girls' mouths? This is not how it should be.

The State further commented:

> [A.S.'s therapist] told you that those are very unusual pictures for a nine-year-old

to be drawing. When you see a nine-year-old drawing, usually they draw their house, the sun, maybe flowers, their friends or family. But no one is drawing penises and vaginas on people. And they're not stick people either.

Finally, the State commented:

> We know that these children are not lying because these children cannot make up this type of story. Look at the acts that they described the detail that they gave. She talks about lubricant. She talks about gel. She talks about hair grease. She talks about condoms. This detail, a child who is between seven and nine years old could not make up.

In *State v. Harvey*, 641 S.W.2d 792, the defendant was convicted of attempted rape. On appeal, he argued that the trial court erred in prohibiting any reference to a prior unrelated sexual assault on the child victim because absent such evidence the jury was left with the assumption that the defendant's alleged actions were the source of her sexual knowledge. *Harvey*, 641 S.W.2d at 798. This court rejected the defendant's argument, finding that the defendant's intent in seeking to introduce evidence relating to the victim's past sexual experience was to attack her credibility by implying that when she described certain acts allegedly performed by the defendant, she actually described events which she learned about at that earlier time. *Id.* We further stated that the victim's sister had fully corroborated the victim's version of events and therefore the defendant was not prejudiced by the trial court not admitting the evidence of the victim's past sexual experience. *Id.*

In *State v. Sloan*, 912 S.W.2d 592, the defendant was convicted of sexual abuse and sodomy. The trial court sustained the

State's motion in limine to exclude evidence, pursuant to the rape shield statute—§ 491.015, discussed *infra*—of any prior sexual conduct by the child victim. *Sloan*, 912 S.W.2d at 598. On appeal, the defendant argued that the trial court erred in prohibiting the victim's grandmother from testifying about the victim's sexual behavior in the year preceding the charged offenses. *Id.* The court upheld the trial court's ruling, citing *Lampley*[3] and *Harvey* and finding that the defendant failed to show why the testimony qualified under the § 491.015.1(1)-(4) exceptions. *Id.* The court further stated that "the testimony of [the victim] was simple, child-like recollections of unlawful touching which was probative without reference to any prior sexual experience or knowledge of any sexual connotation in the conduct attributed to defendant." *Id.* at 599.

In *State v. Lampley*, 859 S.W.2d 909, the defendant was convicted of sodomy. On appeal, the defendant argued that the trial court erred by refusing to allow him to cross-examine the complaining child witness about a previous complaint of sexual abuse involving someone else. *Lampley*, 859 S.W.2d at 910. The defendant contended that the child did not like him and she realized from previous experience that accusing him of sexual molestation would get him out of the home—the same manner in which she benefited from the prior complaint. *Id.* The court stated that the complaining witness may have had a motive to falsely accuse the defendant, and that because of the previous molestation and the subsequent conviction and removal of the offender from her home, evidence regarding the prior abuse was relevant to the witness's credibility. *Id.* at 911. The court held that exclusion of the evidence

violated the defendant's right to a fair trial. *Id.*

In *State v. Sales*, 58 S.W.3d 554, the defendant was convicted of two counts of sodomy. On appeal, he contended that the trial court erred in excluding evidence that one of the victims had previously been sexually victimized in an unrelated attack. *Sales*, 58 S.W.3d at 555. The defendant argued that he had a constitutional right to introduce evidence of the prior abuse because it was relevant to show how the victim, a young boy, could have acquired a precocious sexual knowledge. *Id.* at 557. We stated that it was necessary to consider both the defendant's constitutional rights and the prohibitions of the rape shield statute. *Id.* at 558. We first examined whether the State used evidence of the victim's precocious sexual knowledge to draw an inference for the jury that he gained that sexual knowledge from the defendant's abuse. *Id.* We found that if the State did this, then the defendant was constitutionally entitled to put on a defense showing an alternative source of the knowledge. *Id.* However, we found that the State never presented evidence claiming or suggesting that the child's precocious sexual knowledge was acquired from an encounter with the defendant. *Id.* at 559. We distinguished *Douglas*, where the testimony about the absence of a hymen had only a purpose to support the victim's testimony that the defendant had intercourse with her. *Id.* We also distinguished cases where the State attempted to introduce so-called general profile testimony describing behaviors and other characteristics commonly observed in sexual abuse victims. *Id.* Our conclusion was that the trial court correctly excluded evidence of the victim's previous abuse be-

---

**3.** The court noted in a footnote that in *Lampley* the trial court did not rule directly on this issue, but rather the court stated that the trial court had discretion on the matter and "probably" did not abuse that discretion. *Sloan*, 912 S.W.2d at 598 n. 7.

cause 1) it did not fall within any of the four exceptions in the rape shield statute, and it was not relevant or material to any issue in the case; and 2) the defendant's constitutional rights were not violated in that the State did not attempt to use evidence of the victim's unusual sexual knowledge to establish the defendant's guilt. *Id.* The defendant argued that even though the State did not expressly present evidence of how the victim gained unusual knowledge, the victim's testimony, as well as the comment made by the prosecutor during closing argument, allowed the jury the inference that the victim had an overly mature sexual knowledge because he was abused by the defendant. *Id.* The prosecutor, during closing argument, did improperly pose the question "how does a six and a nine year old know about putting a penis in someone's rectum?" *Id.* Defense counsel objected, and the judge sustained the objection. *Id.* However, the defendant sought no other relief. *Id.* Thus, the judge provided the only remedy requested after the prosecutor's improper comment. *Id.* at 559–60.

▪ As in *Sales,* in our analysis we consider both the prohibitions of the rape shield statute and Samuels' constitutional rights. *Id.* at 558. We first examine whether the State used evidence of the girls' precocious sexual knowledge and physical abnormalities to draw an inference that their knowledge and abnormalities were the result of Samuels' abuse. *Id.* If the State did this, then Samuels was constitutionally entitled to put on a defense showing an alternative source. *Id.*

Section 491.015, the "rape shield statute," provides, in relevant part, as follows:

1. In prosecutions under chapter 566, RSMo, or prosecutions related to sexual conduct under chapter 568, RSMo, opinion and reputation evidence of the complaining witness' prior sexual conduct is inadmissible; evidence of specific instances of the complaining witness' prior sexual conduct or the absence of such instances or conduct is inadmissible, except where such specific instances are:

(1) Evidence of the sexual conduct of the complaining witness with the defendant to prove consent where consent is a defense to the alleged crime and the evidence is reasonably contemporaneous with the date of the alleged crime; or

(2) Evidence of specific instances of sexual activity showing alternative source or origin of semen, pregnancy or disease;

(3) Evidence of immediate surrounding circumstances of the alleged crime; or

(4) Evidence relating to the previous chastity of the complaining witness in cases, where, by statute, previously chaste character is required to be proved by the prosecution.

2. Evidence of the sexual conduct of the complaining witness offered under this section is admissible to the extent that the court finds the evidence relevant to a material fact or issue.

▪ The rape shield statute is designed to protect the victim. *Sloan,* 912 S.W.2d at 598. "Under the rape shield statute, evidence of specific instances of a victim's prior sexual conduct is admissible only if it falls within the specific exceptions set out in the statute and then only to the extent that the court finds it relevant to a material fact or issue in the case." *State v. Smith,* 996 S.W.2d 518, 522 (Mo.App. W.D.1999). "The statute creates the presumption that evidence of the victim's prior sexual conduct is irrelevant to prosecutions under chapters 566 and 568, RSMo." *Id.* The rape shield statute clearly sets forth four exceptions. We interpret stat-

utes by their plain and ordinary meaning, and when a statute's language is clear, we must give effect to that language. *Craven v. State ex rel. Premium Standard Farms, Inc.,* 19 S.W.3d 160, 164 (Mo.App. W.D. 2000). It is not the province of this court to carve out more exceptions than the legislature saw fit to include in the statute. The statute should be interpreted as written by the legislature, and it should remain intact absent any violations of a defendant's constitutional right to due process. Clearly, the evidence Samuels sought to introduce concerning an alternative source of the girls' sexual knowledge does not fall within one of the exceptions set forth in the rape shield statute. Thus, we proceed to address whether prohibiting the admission of such evidence violated Samuels' constitutional right to due process.

■■■ Typically, in a case of this nature, young victims will describe inappropriate experiences in words they should not know. The State has no choice but to present the victim's description of the events. However, we find that for purposes of considering a defendant's due process rights in a case such as the one at bar, there is an important distinction between evidence that is offered as part of presenting the facts of the case, i.e., an essential part of the State's case in chief, and evidence or comments by the State that go the extra step to highlight the testimony to suggest that the defendant is the sole cause of the physical abnormalities or the sole source of the precocious sexual knowledge. If the latter category of evidence is presented, basic principles of fairness entitle the defendant to counter with evidence that there are other potential sources of the abnormalities or knowledge.

In the present case, as previously mentioned, the State said in opening argument that Judith Anderson would testify that A.S.'s ability "to draw some explicit genitalia and explicitly state what they are" is "unusual" for a child who is nine years old. She testified as promised. Then, in closing argument, the State emphasized the girls' unusual language and drawings to suggest that Samuels was the source of the girls' sexual knowledge.

Samuels clearly and repeatedly attempted to present evidence to counter the State's expected evidence regarding the unusual nature of A.S.'s sexually explicit drawings and objected to the State's request to limit his responsive evidence. The court was informed of the nature of Samuels' intended curative evidence through counsel's statements and offer of proof.

The State did present evidence, through Ms. Anderson, of A.S.'s precocious sexual knowledge to draw an inference for the jury that the knowledge was gained solely from Samuels' abuse. The State's closing argument highlights and reinforces that purpose. Accordingly, Samuels "was constitutionally entitled to put on a defense showing an alternative source" of A.S.'s precocious sexual knowledge. *Sales,* 58 S.W.3d at 558.

■■■ The clear intent of the evidence elicited from Ms. Anderson was to point to Samuels as the sole source of the girls' sexual knowledge. Absent such evidence, the rape shield statute would have barred evidence of the victims' prior abuse. However, "the rape shield statute may not be applied so strictly as to deprive the defendant of the fair trial comprehended by the concept of due process." *Douglas,* 797 S.W.2d at 535. A defendant's rights to confront and cross-examine witnesses and to call witnesses in his own defense are "essential to due process and guaranteed by the Fourteenth Amendment." *Id.* Under the circumstances of this case, with regard to the allegations involving A.S. in

Counts I through VI,[4] not allowing Samuels to present his curative evidence resulted in a violation of his due process rights.

▮ With regard to the allegations involving A.B. in Count VII, the State did not introduce this same sort of evidence to suggest Samuels was the sole source of her unusual sexual knowledge. Thus, Samuels' due process rights were not violated when the trial court denied his request to present evidence of past abuse of A.B. by others.

▮ Samuels also complains of the State's comments in closing argument. Some of those comments were broad enough to include references to A.B. regarding the girls' precocious sexual knowledge, which allowed an inference that such knowledge was gained solely from Samuels' abuse. As we noted in our discussion of *Sales, supra,* such comments by the prosecutor may be improper and subject to objection. *Sales,* 58 S.W.3d at 559–60. However, Samuels did not object to any of these comments. "Failure to object at the earliest opportunity to the admission of evidence or argument of counsel constitutes a waiver of the claim." *State v. Jackson,* 768 S.W.2d 614, 617 (Mo.App. E.D.1989). Likewise, "[f]ailure to properly object to [closing] argument at the time it is made to a jury results in a waiver of any right to complain of the argument on appeal, even if the point is preserved in an after trial motion." *Nishwitz v. Blosser,* 850 S.W.2d 119, 124 (Mo.App. E.D.1993). This is because "[i]f the objection is not timely, the trial court has no opportunity to take corrective action at the time the remarks were made." *Id.* Because Samuels did not object to them, we find no error regarding the State's comments about A.B.

▮ Samuels' third argument is that A.S.'s and A.B.'s statements that other men had sexually abused them were relevant and admissible to show the girls' motive to lie.

Samuels argues that he had an interest in showing that A.S. and A.B., after having been removed from the poor living conditions they were subjected to on Troost, began advancing allegations of sexual abuse with respect to the various men in their lives so they would not have to return to the poor living conditions. At trial, A.S. admitted that she did not like living in the house on Troost because it was "crowded" and "messy." Both A.S. and A.B. testified that they liked it in foster care. Moreover, the girls' social worker testified at trial that the children would have been returned to the house on Troost after the house had been cleaned up had the girls not advanced allegations of sexual abuse. Samuels cites *State v. Montgomery,* 901 S.W.2d 255 (Mo.App. E.D.1995), and *State v. Lampley,* 859 S.W.2d 909, in support of his argument.

In *State v. Montgomery,* 901 S.W.2d 255, the defendant was convicted of sodomy. On appeal, he claimed the trial court erred in sustaining the State's motion in limine precluding him from adducing testimony regarding the complaining child witness's prior accusations of abuse against other people. *Montgomery,* 901 S.W.2d at 256. Within a four-year period, the child had accused five different persons, not including defendant, of inappropriately touching her. *Id.* at 257. The eastern district stated that the complaining witness may have had a motive to falsely accuse the defendant, reasoning that the witness testified that she wanted her mother's attention, and the prior allegations of abuse could demonstrate a motive to fabricate by

4. *Of course, prior allegations of abuse would have to be factually similar to demonstrate* that the knowledge or physical abnormality could have multiple sources.

illustrating a pattern of the witness's attempts to get her mother's attention by making allegations of sexual abuse. *Id.* The court concluded that the witness's prior allegations of sexual abuse were relevant to her credibility. *Id.*

In *Lampley,* as previously discussed, the defendant, who was convicted of sodomy with a child, contended that evidence of a prior complaint of sexual abuse made by the child was relevant to show how the child benefited from the prior complaint. *Lampley,* 859 S.W.2d at 910. The court stated that the child may have had a motive to falsely accuse the defendant because she did not like him and from previous experience she knew an accusation of sexual abuse would remove him from the home. *Id.* at 911. The court held that exclusion of the evidence violated the defendant's right to a fair trial. *Id.* The court also pointed out that it was not necessary for defendant's defense to go into the victim's prior sexual conduct; he need only show that a complaint was made which became beneficial to the victim. *Id.*

Both *Montgomery* and *Lampley* are distinguishable from the present case. Both *Montgomery* and *Lampley* involved previous complaints or a pattern of such complaints, and there were indications that the witnesses had received a benefit from the prior accusations of abuse, thus calling their credibility into question. In *Montgomery,* the benefit was the mother's attention. In *Lampley,* the benefit was the removal of the accused abuser from the home. Here, unlike the situations in those cases, there is no indication that either A.S. or A.B. made any previous allegations of abuse and received a benefit from those allegations. There is no connection between any prior allegations of abuse the girls may have made and a motive to lie in the present case. Samuels argues that the girls had a motive to fabricate their accusations so they could get out and stay out of the "messy, crowded" house and because they liked foster care. The evidence does not support his argument. First, the accusations were not made to get out of the home because the girls had already been removed from the home before any allegations of sexual abuse were made. Second, there is no indication the girls believed that if they made allegations of abuse they would not have to return to the home. Whether the children liked living with foster parents is irrelevant because the abuse allegations were made before they went into foster care. Finally, Samuels argued this point to the jury, and it was able to pass on the issue. Therefore, the trial court did not err in finding the evidence of prior allegations of abuse inadmissible for this purpose.

The judgment of the trial court is reversed as to the convictions on Counts I, II, III, IV, V, and VI—the charges involving A.S.—and we remand for a new trial on those counts. The judgment is affirmed on Count VII—the charge involving A.B.—and Count VIII—the charge involving N.W.

TURNAGE, Sr.J., and HANNA, Sr.J. concur.