

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED103044 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Philip D. Heagney |
| ANTONIO RYCRAW, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 27, 2016 |

## Introduction

Appellant Antonio Rycraw ("Rycraw") appeals from the judgment of the trial court entered after a jury trial. The jury convicted Rycraw on four counts of statutory sodomy and two counts of sexual misconduct against Victim, who was between five and eight years old when the incidents occurred. The jury acquitted Rycraw on one count of furnishing pornography to Victim. Rycraw argues that the trial court erred in four respects: (1) in refusing to replace a juror who "dozed off" during evidence; (2) in precluding evidence that Victim had sexual intercourse with a third party; (3) in precluding evidence that Victim had viewed pornography with her brother; and (4) in submitting multiple-act verdict directors for Counts I–V, which deprived Rycraw of his constitutional right to a unanimous jury verdict.

We find no trial-court error on Rycraw's first three points. The record shows that the trial court properly questioned the juror and reasonably concluded that the juror could fulfill her

duties. The trial court also did not abuse its discretion in prohibiting evidence that Victim had intercourse with a third party or viewed pornography because the admission of such evidence was prohibited by the rape shield statute and was not prejudicial. With respect to Rycraw's fourth point, the trial court properly submitted the jury instructions for Counts I, III, and V, but erred in submitting the jury instructions for Counts II and IV because the verdict directors for those counts failed to ensure a unanimous jury verdict. Accordingly, we reverse the trial court's judgment with respect to Counts II and IV, but affirm in all other respects.

Factual and Procedural History

## I. Factual Overview

Rycraw lived in a one-story home with three bedrooms, one bathroom, and a basement. In 2009, five-year-old Victim moved into the home with her mother, father, and siblings. Victim shared one bedroom with her two sisters, while Rycraw had his own bedroom. Rycraw's sister (who also lived in the home) had a relationship with Victim's mother, and Victim referred to Rycraw as "Uncle Tony."

Several years later, then eight-year-old Victim attended a school program that taught students about inappropriate touching. After the program, Victim reported that Rycraw had touched her inappropriately and the school nurse called the child-abuse hotline.

Subsequently, a forensic interviewer from the Child Advocacy Center conducted a videotaped interview with Victim ("CAC interview"). Victim described several inappropriate incidents involving Rycraw. Victim did not describe these incidents chronologically in the video, but the forensic interviewer pressed Victim to identify each act as the "first time" in Rycraw's bedroom, the "second time" in Rycraw's bedroom, or in the bathroom.

With regard to the first incident, Victim reported that she was sitting fully clothed on the bed in Rycraw's bedroom watching a movie. Rycraw and other children were in the bedroom,

2

but at some point the other children left. Victim recalled that Rycraw, who was laying on the bed, unzipped his pants and exposed his "private part."[1] Rycraw reached into Victim's pants and "pushed" on the inside of her vagina; Rycraw's other hand grabbed his exposed genitals. Victim ran away and told her parents about the incident, but her parents simply told her to stay away from Rycraw. According to Victim, Rycraw threatened to shoot her in the head if she told anyone. Victim tried to stay out of Rycraw's bedroom after that incident.

Victim also reported a second incident that occurred in Rycraw's bedroom. This time, Victim told the forensic interviewer that she was sitting on the couch in another room in the house when Rycraw "tricked" her into coming into his bedroom by asking her to bring the cat into his bedroom. Victim said that when she gave Rycraw the cat, Rycraw dropped the cat, touched her vagina, and asked her if she wanted to have sex. Rycraw then pulled out his "private part" and put it in Victim's mouth.

Third, Victim described an encounter that occurred in the only bathroom in the home. Victim had to use the bathroom badly, but Rycraw was showering at the time, so Victim closed her eyes and entered the bathroom. While in the bathroom, Rycraw allegedly showed Victim a "nasty video" on his cell phone depicting pornography. Victim said that while she was in the bathroom, Rycraw forced her to touch his "balls" with her hand. Victim's manual demonstration suggested that she was moving her hand up and down on Rycraw's penis. Victim said she saw a "white thing" come out in the shower and the encounter ended. Victim was unclear whether the two acts (viewing of pornography and hand-to-penis contact) occurred at the same time or at different times, but said both acts took place in the same bathroom.

---

[1] Victim sometimes referred to Rycraw's genitals as "balls."

3

The State charged Rycraw with four counts of felony first-degree statutory sodomy for the inappropriate contact (Counts I, III, V, and VII), two counts of misdemeanor sexual misconduct for genital exposure (Counts II and IV), and one count of furnishing pornography to a minor (Count VI).

## II.    Pretrial Motions

The State moved in limine to prohibit the defense from eliciting evidence that Victim allegedly viewed a pornographic video with her brother. The prosecutor asserted that Victim did not view any actual pornography, but only saw "the title menu of the porn DVD." Defense counsel replied that the evidence was relevant because Rycraw was charged with furnishing pornographic materials to Victim. The trial court granted the State's motion, reasoning that Victim's viewing of a pornographic DVD menu was not relevant to what Victim might have seen in the bathroom with Rycraw.

Invoking the protections of Missouri's rape shield statute, the State also moved in limine to prohibit the introduction of any evidence that Victim had sexual intercourse with a third party. The trial court preliminarily granted the State's motion in limine. Rycraw subsequently filed a written motion under Section 491.015[2] urging the trial court to reconsider. The trial court denied Rycraw's motion. Defense counsel presented an offer of proof consisting of testimony from Rycraw's brother, Leroy Rycraw ("Leroy"[3]).

Leroy testified that, in May or June of 2011, he heard noise on the side of the home. Leroy saw his nephew and Victim outside, through a window. The nephew "had [Victim] bent over, and he was humping on her." Leroy clarified that "humping" meant intercourse. After Leroy's offer of proof, defense counsel argued that Leroy's testimony fell within the third

---

[2] All statutory references are to RSMo (2000).
[3] We use the witness's first name to avoid confusion; no disrespect is intended.

4

exception in the rape shield statute: evidence of immediate surrounding circumstances of the alleged crime. The prosecutor responded that Leroy's testimony would only tarnish Victim's reputation, emphasizing that "the entire point of Section 491 is to prevent that." The trial court precluded the testimony from being admitted into evidence at trial.

## III. Trial

Victim was ten years old when she testified at trial. Victim's trial testimony was scattered, and she did not express a clear order of events. Victim recalled that Rycraw put his hands in her pants and touched her "private area" when she was in his room watching television. Victim next testified about the bathroom incident. Rycraw was taking a shower while Victim had to use the restroom. Victim entered the bathroom to use the toilet. While in the bathroom, Rycraw allegedly showed her pornography on his phone. Next, Victim mentioned "the cat thing," where Rycraw asked Victim to bring him the cat. Victim testified that Rycraw started touching her, and she ran. At the end of Victim's testimony, the prosecutor asked Victim if Rycraw had touched any other part of her body. Victim replied, "No, but he made me touch something of his." Victim explained that her hands touched Rycraw's "front area" and that this contact happened in "the room." Victim remembered moving her hand up and down until she saw "white stuff." When the prosecutor asked if Victim had touched any other part of Rycraw's body, she replied, "He tried to make me suck it." Victim explained that her lips touched Rycraw's "front area." Victim did not explain where this penis-to-mouth contact occurred.

The State also played the recorded CAC interview for the jury. While the video was being played, defense counsel heard Juror Washington snort aloud and saw another juror attempt to wake Juror Washington with a slap. After the video was played, defense counsel informed the trial court that Juror Washington "was asleep for at least part" of the CAC interview. Thus, defense counsel moved to replace Juror Washington with an alternate juror. The prosecutor

5

acknowledged seeing Juror Washington's eyes closed and requested that the trial court question the juror. Juror Washington was questioned outside the presence of the rest of the jury:

| | |
|---|---|
| [Trial court]: | … Ms. Washington, about when we were watching that tape or the DVD this afternoon from the CAC, and at one point it looked like you had dozed off. Had you? |
| [Juror]: | Yes, sir. |
| [Trial court]: | Okay. And do you know how much of the tape or how much of the DVD you might have missed? |
| [Juror]: | My fellow jurors said about two seconds. I was—I work nights. I'm trying to get used to this being up. That's— |
| [Trial court]: | That makes it hard? |
| [Juror]: | Yes, sir. I'm going to do better. I didn't miss a lot. I got my notes and everything. I'm sorry. |
| [Trial court]: | Okay. Thank you. And I just want to check with you. Do you believe—and there is no right or wrong answer here. We've got alternate jurors if we need somebody to step up and fill in for you, but do you believe that you've been able to pay attention to the evidence and to hear and see the evidence that's been presented so far? |
| [Juror]: | Yes, sir, I do believe. |
| [Trial court]: | Okay. |
| [Juror]: | Yes, sir, and yes, sir and yes, ma'am. |
| [Trial court]: | And do you feel that given that you dosed [sic] off for a little bit watching the CAC DVD that you have the information you need to continue to serve as a juror or you don't have that information? |
| [Juror]: | I have that information. I have that information, and I have that information over there, young man. |
| [Trial court]: | Okay. Let me just check and see. [The prosecutor], do you have any questions that you want to ask Ms. Washington? |
| [Prosecutor]: | The other jurors said it was about two seconds? |
| [Juror]: | Yeah. |
| [Prosecutor]: | So you don't feel like you fell asleep for like a couple of minutes? |
| [Juror]: | No. |
| [Prosecutor]: | Nothing further. |
| … | |
| [Defense counsel]: | Ms. Washington, is it fair to say you don't know how long you were asleep because you were asleep? |
| [Juror]: | No, I don't think that's fair to say that, because I know as soon as I did it, they touched me and I kind of caught myself. I was trying to anyway catch myself. |
| [Defense counsel]: | Did you hear yourself snore, kind of snort? |
| [Juror]: | I heard myself do the (indicating). Yes, I did. |

[Defense counsel]: I don't have anything else.

Juror Washington apologized and promised to do better the next day. The trial court denied the motion to substitute an alternate juror, noting that Juror Washington assured the court she was asleep for only a short time. The trial court was further satisfied that Juror Washington had seen and heard the evidence, and that she could continue to fulfill her duty as a juror.

## IV.    Jury Instructions, Closing Argument, and the Verdict

Before the case was submitted to the jury, Rycraw objected to several verdict directing instructions on the ground that they violated Rycraw's constitutional right to a unanimous verdict because the verdict directors allowed convictions for multiple acts of sexual misconduct.

First, Rycraw objected to Instruction Nos. 5 and 7, the verdict directors for Counts I and III. Each of the verdict directors charged first-degree statutory sodomy for hand-to-vagina contact. Instruction No. 5 (Count I), in relevant part, stated that the jury must find beyond a reasonable doubt: "First, that ... the defendant knowingly placed his hand on [Victim's] genitals." Instruction No. 7 (Count III) was identical to Instruction No. 5, except for an addition to the end: "First, that ... defendant knowingly placed his hand on [Victim's] genitals a second time."

Next, Rycraw objected to Instruction Nos. 6 and 8, the verdict directors for Counts II and IV. Each of these verdict directors charged Rycraw with exposing his genitals to Victim. Instruction No. 6 (Count II) in relevant part, required the jury to find: "First, that ... the defendant exposed his genitals." Instruction No. 8 (Count IV), was identical to Instruction No. 6 except for the language added to the end: "First, that ... defendant exposed his genitals a second time."

7

Rycraw also objected to Instruction No. 9, the verdict director for Count V, charging first-degree statutory sodomy for penis-to-mouth contact. Instruction No. 9 required the jury to find: "First, that … the defendant knowingly put his penis in [Victim's] mouth."

Defense counsel argued that the jury could be confused because the verdict directors did not "sufficiently differentiate[] between multiple separate acts of sexual misconduct" and did not "ensure that the jury will unanimously convict the defendant of the same act." The State reasoned that the acts alleged in Counts I and III, and Counts II and IV, were sufficiently differentiated because the modifier, "a second time," enabled the jurors to distinguish between the separate acts committed on different days in the bedroom. The trial court overruled the objections, finding sufficient distinguishing factors to separate the two alleged incidents.

During closing argument, the prosecutor carefully outlined the case to the jury, count by count. The prosecutor explained that Counts I and II related only to the first alleged incident in Rycraw's bedroom: "this is where she says he put his hand on her vagina and pushed it. She used the word 'pushed it on the inside.' That's what she's talking about. That's Count I." The prosecutor then stated, "So Count II is based on the same first time as she says in the CAC. The first time when he also committed pushing the vagina…."

The prosecutor then explained that Counts III and IV related solely to the acts committed by Rycraw during the second incident in his bedroom. The prosecutor argued that Rycraw engaged in hand-to-vagina sodomy during the second bedroom incident (Count III) and that Rycraw exposed "his genitals a second time," which constituted the sexual misconduct alleged in Count IV. The prosecutor recounted that Counts III and IV occurred after "the cat incident."

The prosecutor explained that Count V related to yet "another statutory sodomy in the first degree, but this is different conduct. This is mouth of [Victim] and defendant's penis."

8

After closing arguments, the case went to the jury. During deliberations, the jury requested and received the CAC interview video. The jury subsequently acquitted Rycraw of furnishing pornography to a minor (Count VI), but convicted Rycraw on all other counts. The trial court sentenced Rycraw to a total of twelve years in prison. This appeal follows.

## Points on Appeal

Rycraw raises four points on appeal. First, Rycraw argues that the trial court abused its discretion by failing to remove a juror who "dozed off" during the Victim's videotaped CAC interview. Second, Rycraw asserts that the trial court abused its discretion in precluding evidence that Victim was observed having sexual intercourse with another person. Third, Rycraw contends that the trial court abused its discretion by not allowing evidence that Victim had viewed a pornographic video. Finally, Rycraw argues that the trial court erred in submitting verdict directors for Counts I–V because the verdict directors failed to sufficiently differentiate between the multiple charged acts, which violated Rycraw's constitutional right to a unanimous jury verdict.

## Discussion

### I.    Point One—Sleeping Juror

Rycraw argues that the trial court abused its discretion by refusing replace Juror Washington when the juror briefly "dozed off" while watching the CAC interview.

#### A.    Standard of Review

The substitution of a juror during trial is a matter entrusted to the trial court's discretion. State v. Rose, 169 S.W.3d 132, 134 (Mo. App. E.D. 2005) (citing State v. Naucke, 829 S.W.2d 445, 461 (Mo. banc 1992)). We will not disturb a trial court's ruling on this issue absent an abuse of that discretion. State v. Williams, 427 S.W.3d 259, 264 (Mo. App. E.D. 2014). The trial court retains such broad discretion because it is best positioned to determine a juror's ability

9

to hear the case effectively. Id. A trial court abuses its discretion only when the ruling is clearly against the logic of the existing circumstances, and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. State v. Peeples, 288 S.W.3d 767, 775 (Mo. App. E.D. 2009).

B.    No Abuse of Discretion

In considering whether the trial court abused its discretion, our opinion in Williams is instructive. In Williams, defense counsel requested a sidebar and informed the trial court that a juror was "substantially nodding off." 427 S.W.3d at 263. Defense counsel noted at least ten times during testimony where the juror had "closed his eyes and his head went down and then he stumbled." Id. After closing arguments, defense counsel moved to replace the juror, and the trial court examined the juror. Id. The juror admitted to nodding off, but he reported that another juror had nudged him once or twice and that he had not fallen asleep. Id. The juror also stated that he had heard all the evidence and would be capable of proceeding in the case. Id. After the examination, the trial court denied defense counsel's motion. Id. at 264. The trial court acknowledged that it had noticed the juror nodding off, but also found that the juror was asleep "no more than an instant. … Second or two. It certainly wasn't of any length and then— and then he—he was up." Id.

On appeal, this Court found no abuse of discretion. Id. We noted the trial court's finding that the juror would almost immediately recover after nodding off and that the juror otherwise appeared to be attentive. Id. We also acknowledged the juror's belief that he had not fully fallen asleep and that he had not missed the presentation of any evidence. Id. Thus, we deferred to the trial court's determination because the trial court was in a "far better position than this Court to gauge the attentiveness of the juror." Id. at 265

10

We see no convincing reason to depart from Williams. As there, defense counsel here noted that Juror Washington was dozing during testimony. The trial court then examined the juror. Juror Washington admitted that she had "dozed off," but insisted that she dozed for only two or three seconds before another juror nudged her. Juror Washington apologized, said she "didn't miss a lot," and explained that she had taken notes about the evidence. The trial court accepted Juror Washington's explanation. The trial court also noted that Juror Washington could view during deliberations any portion of the CAC interview she might have missed.

While in Williams the trial court personally witnessed the juror dozing; here, the trial court relied on Juror Washington's report about the occurrence. While someone who has nodded off might not realize how long he or she was asleep, Juror Washington reported that another juror said she was only sleeping a few seconds. The prosecutor also acknowledged seeing Juror Washington's eyes closed, but noted that Juror Washington also scratched herself during that time so it was unclear whether she was sleeping. Finally, Juror Washington told the trial court that she "caught herself" falling asleep as she heard herself 'snorting' as she dozed off. The record before us suggests the trial court could reasonably conclude that Juror Washington was briefly asleep, as in Williams, but for no more than a few seconds.

Following a thorough inquiry, the trial court was confident that Juror Washington had missed limited portions of the CAC interview, which she could view in deliberations, and that she was capable of continuing. The trial court is best positioned to determine a juror's ability to hear the case effectively, which is why we afford the trial court such broad discretion. Williams, 427 S.W.3d 264. With facts so similar to Williams, we are not persuaded that the trial court's actions were so arbitrary and unreasonable as to shock our sense of justice and indicate a lack of

11

careful consideration. Peeples, 288 S.W.3d at 775. Thus, the trial court did not abuse its discretion in refusing to remove Juror Washington from the jury. Point One is denied.

## II.     Points Two and Three—Evidentiary Issues

Rycraw asserts that the trial court erred in excluding evidence under the rape shield statute (Point Two) and under a general relevance theory (Point Three). As evidentiary issues, we address both points together.

### A.     Standard of Review

The trial court wields broad discretion to admit and exclude evidence at trial. State v. Smith, 314 S.W.3d 802, 807 (Mo. App. E.D. 2010). A trial court abuses its discretion only when the challenged ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id.

Further, we review for prejudice in addition to error. State v. Zink, 181 S.W.3d 66, 73 (Mo. banc 2005). Thus, we "will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." Id. (quoting State v. Middleton, 995 S.W.2d 443, 452 (Mo. banc 1999)). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." Zink, 181 S.W.3d at 73.

### B.     Point Two—Rape Shield Statute

Rycraw argues that the trial court erred in not allowing evidence at trial that Victim had engaged in sexual intercourse with a third party. We disagree.

The rape shield statute, found in Section 491.015, creates a presumption that a victim's prior sexual conduct is not relevant to sex-crime prosecutions. State v. Johnson, 479 S.W.3d

12

762, 766 (Mo. App. E.D. 2016). Section 491.015.1 states, "evidence of specific instances of the complaining witness' prior sexual conduct ... is inadmissible," unless a listed exception applies.[4]

If one of the exceptions is met under subsection 1, the evidence is admissible only to the extent that the evidence is also "relevant to a material fact or issue." Section 491.015.2; State v. Jones, 716 S.W.2d 799, 800 (Mo. banc 1986). Generally, evidence is not independently admissible under the relevance test in Section 491.015.2; thus, an express exception under subsection 1 must be met before proceeding to the relevance analysis under subsection 2. Jones, 716 S.W.2d at 800.

However, we also note that the rule stated in Jones cannot be so strictly applied "as to deprive the defendant of the fair trial comprehended by the concept of due process." State v. Douglas, 797 S.W.2d 532, 535 (Mo. App. W.D. 1990). For example, in Douglas, the State presented evidence of Victim's lack of hymenal tissue, suggesting that the alleged crime caused the absence of hymenal tissue. Id. at 534. The Western District held, "To allow the State to show that [victim's] hymen was absent, with the clear and calculated implication that its absence was caused by intercourse with the defendant, then to forbid defendant to show that [victim] had had intercourse with another, was violative of defendant's right to a fair trial." Id. at 535–36. Courts have applied the rationale of Douglas in situations where the State emphasized the victim's unusual sexual knowledge, noting that it would violate a defendant's due process rights to prohibit evidence that the victim may have obtained the unusual sexual knowledge from another source. State v. Samuels, 88 S.W.3d 71, 82 (Mo. App. W.D. 2002).

Rycraw posits that evidence of Victim's alleged intercourse with a person other than Rycraw was admissible under a third exception, as "[e]vidence of immediate surrounding

---

[4] The exceptions to the rape shield statute are listed in Section 491.015.1(1)–(4).

13

circumstances of the alleged crime." Section 491.015.1(3). The third exception is very similar to the theory of res gestae. State v. Smith, 157 S.W.3d 379, 383 (Mo. App. E.D. 2005). Broadly speaking, res gestae "includes circumstances, facts, and declarations incidental to the main fact or transaction, and necessary to illustrate its character, and acts, words, and declarations which are so closely connected to the main fact or transaction as to constitute a part of it." Id. (citing 29A Am.Jur.2d *Evidence* § 860 (1994)). Thus, acts shown under res gestae are admissible where they "precede the offense immediately or by a short interval of time and tend, as background information, to elucidate a main fact in issue." Smith, 157 S.W.3d at 383 (citing State v. Sherman, 637 S.W.2d 704, 706 (Mo. banc 1982)).

For example, in Smith, the State charged Smith with forcible rape. 157 S.W.3d at 380. Under the State's theory, Smith, the victim, and victim's boyfriend were all at Smith's house. Id. The victim and her boyfriend had consensual sex in a bedroom. Id. When the boyfriend left the room, Smith entered and raped the victim. Id. Under Smith's contradictory theory, the three had consensual sex together. Id. The boyfriend first taped the victim masturbating. The victim and the boyfriend then had consensual sex, and then Smith joined. Id. At trial, Smith attempted to introduce the tape of the victim masturbating. Id. at 381.

This Court considered whether the third exception to the rape shield statute allowed the admission of the masturbation video into evidence at trial. Id. at 383. We held that the third exception applied because the videotaping, the consensual sex, and the alleged crime all occurred on Smith's bed in the same evening. Id. We found the masturbation video relevant to the charged crime because it was filmed a short time prior to the alleged crime and was "intertwined with the events that night." Id. Because the video provided the factfinder with a complete and coherent picture of Smith's version of events, the video should have been admitted into evidence

14

as part of the res gestae. Id. Accordingly, we found an abuse of discretion and reversed. Id. at 383–84.

Rycraw argues that the same exception applies here. Rycraw maintains that the alleged intercourse with Rycraw's nephew was immediately surrounding the alleged crimes because the alleged intercourse occurred within the timeframe charged in the State's indictment. The flaw in Rycraw's argument is that Rycraw was charged with committing his crimes between May 7, 2010, and May 7, 2012, a two-year period. Rycraw suggests that evidence of Victim's alleged intercourse with his nephew was "immediately surrounding" the crime because the incident fell "within the [two-year] charged time period." Rycraw's argument fails. There is no evidence in the record that Victim's alleged intercourse with the third person occurred on the same day or at any time close to the time of Rycraw's alleged abuse. The record does not support a finding that Victim's alleged intercourse with Rycraw's nephew was "intertwined" with the events surrounding the charged crimes, nor did it "precede the offense immediately or by a short interval of time." Smith, 157 S.W.3d at 383. Thus, the evidence of alleged intercourse was not admissible under Section 491.015.1(3).

Rycraw next contends that evidence of Victim engaging in sexual intercourse with the third party would have shown an alternative source of Victim's sexual knowledge. This argument is unavailing for several reasons. First, an alternate source of sexual knowledge does not fall under any of the explicit exceptions to the rape shield statute. See Section 491.015.1(1)–(4). Further, the record does not suggest that the State argued Rycraw's acts were the *only* source of victim's sexual knowledge. Cf. Samuels, 88 S.W.3d at 82. Nor did the State argue that Victim suffered an injury solely due to Rycraw's sexual abuse. Cf. Douglas, 797 S.W.2d at

534–35. Thus, applying the rape shield statute would not violate Rycraw's constitutional right to a fair trial.[5]

Because the evidence of Victim having intercourse with a third person was not admissible under the protections mandated by the rape shield statute, the trial court did not abuse its discretion in excluding the evidence. Point Two is denied.

C.      Point Three—Evidence of Victim Viewing Pornography

Rycraw next argues that the trial court abused its discretion by precluding evidence that Victim had previously viewed her brother's pornographic video. Specifically, Rycraw asserts that the evidence did not fall within the rape shield statute, and the evidence was therefore admissible because it was relevant. On appeal, Rycraw provides two theories of relevance. The first theory of relevance is that Victim's prior viewing of pornography was relevant to her credibility with respect to all of the charged offenses because the evidence provided an alternate source of Victim's knowledge of idiosyncratic sexual details. For example, Victim's testimony about the characteristics of semen and her demonstration of the hand-to-penis contact might have derived from the pornographic content rather than her personal experience with Rycraw. Rycraw's second theory of relevance is that the evidence provided an alternate source—other than Rycraw—of the pornography furnished to Victim. The presence of an alternate source of pornography was relevant to defend against Rycraw's charge of furnishing pornography to a minor (Count VI).

However, Rycraw only presented this second theory of relevance to the trial court. During the pretrial motion in limine, defense counsel argued, "I think it's relevant because one of

---

[5] Rycraw also asserts that this evidence was relevant to the sexual-misconduct charges to show that Victim would not have been alarmed by seeing Rycraw's genitals. This argument is also meritless. The relevance of such evidence does not matter, as discussed above, unless the evidence first falls within an exception to the rape shield statute under Section 491.015.1. Thus, we do not reach the relevance analysis under Section 491.015.2.

16

the charges is that my client is charged with furnishing pornographic materials to a minor." Defense counsel did not argue that the evidence was relevant to Victim's credibility. Defense counsel relied on the same argument when the issue was raised again at trial. An appellant cannot broaden the scope of his objections beyond the grounds relied upon at trial. State v. Johnson, 207 S.W.3d 24, 43 (Mo. banc 2006); State v. Driskill, 459 S.W.3d 412, 426 (Mo. banc 2015). Thus, Rycraw is limited to this second theory of relevance on appeal.

Even assuming arguendo that trial-court error occurred, Rycraw suffered no prejudice. Rycraw was *acquitted* on Count VI—the only count charging Rycraw with furnishing pornography to Victim. Given Rycraw's acquittal on the only count for which the evidence was purportedly relevant, there is no reasonable probability that any error affected the outcome of the trial. Zink, 181 S.W.3d at 73. Accordingly, we find no prejudice. Point Three is denied.

## III.    Point Four—Jury Instructions

Rycraw asserts that the trial court erred in submitting verdict directors for the separate charges of first-degree statutory sodomy (Counts I, III, and V) and the separate charges of sexual misconduct (Counts II and IV). Relying on our Supreme Court's decision in State v. Celis-Garcia, 344 S.W.3d 150 (Mo. banc 2011), Rycraw contends that the general allegations of sexual misconduct set forth in the verdict directors allowed jurors to possibly base their decision on separate and distinct acts, and as a result, failed to ensure that the jury rendered a unanimous verdict.

### A.    Standard of Review

We review de novo, as a question of law, whether the jury was properly instructed. State v. Richards, 300 S.W.3d 279, 281 (Mo. App. W.D. 2009); State v. Murray, 428 S.W.3d 705, 709 (Mo. App. E.D. 2014). However, we only reverse a jury's verdict based on a faulty jury instruction if the defendant has suffered prejudice. Richards, 300 S.W.3d at 281. "If the giving

17

of [an] instruction is error, it will be held harmless only when the court can declare its belief that it was harmless beyond a reasonable doubt." Id. (quoting State v. Erwin, 848 S.W.2d 476, 483 (Mo. banc 1993)). "A defendant need not establish that the jury was more likely than not to have misapplied the instruction. It is sufficient that there is a 'reasonable likelihood that the jury has misapplied the challenged instruction' in a way which violates the defendant's constitutional rights." Erwin, 848 S.W.2d at 483 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).

B.    Constitutional Requirement of Jury Unanimity

Article I, Section 22(a) of the Missouri Constitution guarantees a criminal defendant the right to a unanimous jury verdict. Celis-Garcia, 344 S.W.3d at 155 (citing State v. Hadley, 815 S.W.2d 422, 425 (Mo. banc 1991)). The danger of a non-unanimous jury verdict often arises in a "multiple acts" case. Celis-Garcia, 344 S.W.3d at 155–56. A "multiple acts" case occurs "when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count." Id.

In "multiple acts" cases, the threat to unanimity exists when the verdict director generally lists the elements of the offense, and those elements could be satisfied by differing and distinct acts of the defendant introduced into evidence. State v. Watson, 407 S.W.3d 180, 184 (Mo. App. E.D. 2013). In this situation, the possibility exists that jurors would carefully follow the trial court's instructions, yet base their vote to convict a defendant on differing conduct. Id. Because individual jurors could rely upon differing conduct to base their finding of guilt under the instructions, the possibility exists that the jury of twelve might agree on a finding of guilt, but not unanimously agree upon the conduct supporting the defendant's conviction. Id. Again, we are principally concerned that the jury's verdict reflects unanimous agreement upon the same act or acts upon which the alleged crime is based. See Celis-Garcia, 344 S.W.3d at 156.

18

The concern with "multiple acts" cases is illustrated by the facts of Celis-Garcia, where the evidence considered by the jury suggested that the defendant committed at least seven separate acts of statutory sodomy against two victims at different times and in different locations. 344 S.W.3d at 156. The victims alleged that acts of sodomy occurred on the back porch, in the bedroom, in the bathroom, and in an outside shed. Id. The verdict directors included broad language, allowing the jury to convict the defendant if it believed "that between [specified dates] ... the defendant or [her boyfriend] placed her or his hand on [the victim's] genitals...." Id. Importantly, under the verdict director, a jury could have convicted the defendant of sodomy resulting from hand-to-vagina contact if the jury believed that the incident occurred in the bedroom, *or* on the back porch, *or* in the shed, *or* in the bathroom. Id. Thus, the verdict director impermissibly allowed a conviction for any hand-to-vagina contact for *any* of the defendant's actions, rather than ensuring unanimous juror agreement that a specific act at a specific location occurred. Id. at 158.

Celis-Garcia identified two alternative solutions to remedy a "multiple acts" problem in a way that protects a defendant's constitutional right to a unanimous verdict. 344 S.W.3d at 157. First, the State can identify a particular criminal act to support each individual charge, and submit that individual charge with its own verdict director. Id.; MAI-CR 3d 304.02, Note on Use 7. An example of this election occurred in State v. Edwards, where the trial evidence depicted "multiple, distinct acts of sodomy, each of which could have served as the basis for a criminal charge." 365 S.W.3d 240, 247 (Mo. App. W.D. 2012). The State identified the specific act of sodomy by specifying in the verdict director that the sodomy was penis-to-anus contact. Id. Because there was only *once instance* of penis-to-anus contact in evidence, "this specificity in

19

the verdict director prevented the jury from finding Edwards guilty of any sodomy not involving penile to anal contact." Id.

A second means of addressing the instructional challenge in a "multiple acts" case allows the State to charge that a defendant engaged in multiple acts under one count of statutory sodomy. However, in such cases, the verdict director must *specifically describe* those individual criminal acts, and require the jury to agree unanimously on the act or acts that occurred. Celis-Garcia, 344 S.W.3d at 157; MAI-CR 3d 304.02, Note on Use 7; MAI-CR 3d 304.16. "The key to juror unanimity is a finding that encompasses the same criminal conduct and the same singular event." MAI-CR 3d 304.02, Note on Use 7.

C.    Analysis

Applying the above doctrine, we consider Rycraw's claims that the jury instructions violated his right to a unanimous verdict. Rycraw argues that we should reverse Counts I–V. Counts I and III allege separate instances of Rycraw's hand touching Victim's genitals. Counts II and IV allege separate instances of Rycraw exposing his genitals to Victim. Finally, Count V alleged that Rycraw forced his penis to touch Victim's mouth. We will address Rycraw's arguments in turn.

### 1.    Counts I and III: Hand-to-Vagina Contact

The conduct at issue in Counts I and III is Rycraw's alleged sodomy by touching Victim's vagina with his hand on two separate occasions. Instruction Nos. 5 and 7 are the verdict directing instructions for the charges of first-degree statutory sodomy set forth in Counts I and III. These instructions state, in relevant parts:

> Instruction No. 5: As to Count I, if you find and believe from the evidence beyond a reasonable doubt: First, that … the defendant knowingly placed his hands on [Victim's] genitals …

20

Instruction No. 7: As to Count III, if you find and believe from the evidence beyond a reasonable doubt: First, that ... the defendant knowingly placed his hands on [Victim's] genitals *a second time* ... (Emphasis added.)

Rycraw notes that the only distinction in the verdict directors between Counts I and III is the language: "a second time," and suggests that this modifier fails to describe the alleged crimes with enough detail to ensure that "the jury unanimously convicted [him] of the same act or acts." Celis-Garcia, 344 S.W.3d at 156.

Conversely, the State argues that the words "a second time" sufficiently distinguish between Counts I and II because the phrase alerted the jury to whether the charge pertained to the first incident of hand-to-vagina sodomy in the bedroom or to the second incident, which occurred in the bedroom at a later date. The State correctly notes that the verdict directors mirror the language "first time" and "second time" as used by the Victim to distinguish between the two acts, and further notes that the prosecutor stressed this distinction in closing argument.

Importantly, the record presents evidence of only two possible instances of hand-to-vagina contact, both of which occurred at different times in Rycraw's bedroom. The first incident occurred while Victim was watching television in the bedroom. The second act of hand-to-vagina contact occurred at a different time in Rycraw's bedroom after Rycraw allegedly lured Victim into his bedroom by asking her to bring the cat. The verdict directors for Counts I and III follow the guidance of Celis-Garcia by charging Rycraw with two separate counts, one for the first act (Count I) and one for the second act (Count III) and describing the separate acts with sufficient clarity so as require juror unanimity to render a conviction on both counts. We see no potential for juror confusion by limiting the modifer in Instruction 7 to the phrase "a second time" because the evidence presented the jurors with only two acts of sodomy, the first and then the second. Point 4 is denied with regard to Counts I and III.

21

## 2.    Counts II and IV: Genital Exposure

Rycraw asserts that the verdict directors for Counts II and IV also violated his right to a unanimous jury verdict.  We agree.

Instructions Nos. 6 and 8 are the verdict directing instructions for the charges of sexual misconduct set forth in Counts II and IV.  The conduct at issue in Counts II and IV was Rycraw's alleged exposure of his genitals to Victim on two separate occasions.  The verdict directors for Counts II and IV were patterned in the same way as those in Counts I and III.  The verdict directors for Counts II and IV of sexual misconduct state, in the relevant parts:

> Instructions No. 6:  As to Count II, if you find and believe from the evidence beyond a reasonable doubt: First, that ... the defendant exposed his genitals ...

> Instructions No. 8:  As to Count IV, if you find and believe from the evidence beyond a reasonable doubt: First, that ... the defendant exposed his genitals *a second time* ... (Emphasis added.)

The circumstances of these sexual-misconduct verdict directors are distinguishable from the hand-to-vagina sodomy allegations set forth in Counts I and III above.  The evidence relating to Counts I and III suggested only two acts of hand-to-vagina sodomy, which were charged as two counts.  Similarly, the State charged Rycraw in Counts II and IV with committing two distinct acts of sexual misconduct as a result of exposing his genitals to Victim.  But the evidence presented to the jury suggests three distinct and separate instances where Rycraw is alleged to have exposed his penis to Victim: (1) the first time in the bedroom where hand-to-vagina contact allegedly occurred, (2) in the bathroom where hand-to-penis contact allegedly occurred, and (3) the second time in the bedroom where hand-to-vagina contact allegedly occurred.

The challenge presented with this scenario is that the jurors were not required to unanimously agree on the specific acts of genital exposure in order to render a guilty verdict in either Counts II or IV.  Instruction No. 6 (Count II) requires the jury to find only that the

22

defendant exposed his genitals. Instruction No. 8 (Count IV) requires the jury to find only that the defendant exposed his genitals a second time. What act must the jury conclude provides the basis for conviction under Instruction 6—the first exposure in the bedroom or the exposure in the bathroom? What act must the jury conclude provides the basis for conviction under Instruction 8—the second exposure time in the bedroom or the exposure in the bathroom? Without greater specificity in the verdict directing instructions as mandated by Celis-Garcia, we have no way of knowing if the jury unanimously agreed upon which of these three acts provided the basis for the two convictions rendered under Instruction Nos. 6 and 8. Unlike the verdict-directing instructions for Counts I and III, the evidence suggests the possibility of three separate acts of genital exposure, which is one more than the number of acts described in the verdict directing instructions. This circumstance is markedly dissimilar from the facts presented in Counts I and III, which presented no opportunity for a non-unanimous verdict. There, the two acts of hand-to-vagina sodomy set forth in the verdict directing instructions matched the only two possible acts of hand-to-vagina sodomy presented by the evidence.

A hypothetical allocation of juror votes illustrates the possibility of non-unanimous verdicts with regard to Counts II and IV. Assuming all other elements are met, the following presents a hypothetical breakdown of jurors on the issue of whether Rycraw exposed himself to Victim:

|                        | Jurors 1–3 | Jurors 4–6     | Jurors 7–9     | Jurors 10–12   |
|------------------------|------------|----------------|----------------|----------------|
| First Time In Bedroom  | Guilty     | Guilty         | Guilty         | **Not Guilty** |
| In Bathroom            | Guilty     | Guilty         | **Not Guilty** | Guilty         |
| Second Time In Bedroom | Guilty     | **Not Guilty** | Guilty         | Guilty         |

In this hypothetical, only nine jurors (Jurors 1–9) believed that Rycraw exposed his penis to Victim in the first bedroom incident, only nine jurors (Jurors 1–3 and 7–12) believed that Rycraw exposed his penis to Victim in the bathroom, and only nine jurors (Jurors 1–6 and 10–

23

12) believed that Rycraw exposed his penis to Victim in the second bedroom incident. Importantly, none of the specific acts of genital exposure received a unanimous twelve-member guilty vote.

However, the verdict directors for Counts II and IV would nevertheless allow our hypothetical jury to render guilty verdicts for both counts. Under the verdict director for Count II, the jury could convict if it believed that Rycraw "exposed his genitals" to Victim. Our hypothetical jury would have found guilt because all twelve jurors believed that Rycraw "exposed his genitals" at least once. Likewise, under the verdict director for Count IV, a jury could convict if it found that Rycraw exposed his genitals to Victim "a second time." Our hypothetical jury would have convicted because all twelve jurors believed that Rycraw exposed his genitals twice—or, "a second time."

But our hypothetical jurors did not unanimously agree that any specific act occurred; instead, each act of alleged exposure received only nine guilty votes. Thus, "the possibility exists that jurors follow all instructions, yet individually choose differing instances of the crime on which they base the conviction." Watson, 407 S.W.3d at 184. Accordingly, the verdict directors for Counts II and IV constituted instructional error.

Having found instructional error, we must consider whether this instructional error constituted prejudice to Rycraw. Here, the evidence suggested at least *three distinct instances* of genital exposure—the first time in the bedroom, the bathroom, and the second time in the bedroom—but the State only charged *two counts*. Thus, unlike the facts in Counts I and III above, twelve jurors possibly could believe that Rycraw exposed his genitals to Victim and that Rycraw exposed himself to Victim "a second time," without reaching unanimous agreement on

24

any specific act. Our hypothetical above supplies one of many ways a jury could reasonably reach two guilty verdicts without unanimous agreement on any specific act.

The State argues that Rycraw's "right to a unanimous verdict was ... protected when the State during closing argument identified each specific act borne out by the evidence and attached each act to a specific count." We recognize that the State went through each count and assigned a specific act to each count. Specifically, the State argued that Count II occurred the first time in Rycraw's bedroom and that Count IV occurred the second time in Rycraw's bedroom. We see no misstatements of the evidence or any attempt to confuse the jurors given the various charges. However, to find no prejudice beyond a reasonable doubt, we would be required to assume that the jury followed the prosecutor's argument. We cannot. We presume the jury followed the *instructions* given by the trial court, State v. McFadden, 369 S.W.3d 727, 752 (Mo. banc 2012), not the prosecutor's closing arguments. Not only does the plain language of the verdict directors allow non-unanimous verdicts on Counts II and IV, but Instruction No. 16 specifically tells the jury that closing arguments are not evidence. Instruction No. 16 also tells the jury, "It is your duty, and yours alone, to render such verdict under the law and the evidence as in your reason and conscience is true and just." Given these instructions—that we presume were followed—we cannot conclude beyond a reasonable doubt that the jury disregarded the plain language of the verdict directors (for Counts II and IV) and the other instructions, and decided instead to follow the prosecutor's argument.

We do not know the specifics of the jury deliberation, nor can we pretend to know what happened in that jury room. But a reasonable likelihood,[6] as shown in the above hypothetical, of

---

[6] We note a difference in our standard of review from Celis-Garcia, where the instructional error was unpreserved and reviewed under our plain-error standard. 344 S.W.3d at 158–59. Thus, we found that the instructional errors misdirected the jury in a way that affected the verdict, resulting in manifest injustice. Id. Here, we are dealing with preserved error; Rycraw's burden to show prejudice is less. Rather than showing that error affected the verdict in a

25

non-unanimous guilty verdicts on Counts II and IV precludes us from finding that the trial court's error was harmless beyond a reasonable doubt. Point 4 is granted wth regard to Counts II and IV.

### 3.    Count V: Penis-to-Mouth Contact

Rycraw asserts that the verdict director for Count V violated his right to a unanimous jury verdict. We are not persuaded.

The verdict director for Count V of first-degree statutory sodomy stated, in the relevant part: "As to Count V, if you find and believe from the evidence beyond a reasonable doubt: First, that ... the defendant knowingly put his penis in [Victim's] mouth ...."

Rycraw maintains that the State presented evidence of multiple acts of penis-to-mouth contact and that the single verdict director failed to specifically identify which act supported the conviction for statutory sodomy. Our review of the record shows that the State introduced evidence of a singular incident of mouth-to-penis contact. In her videotaped interview, Victim stated that Rycraw made her put her mouth on his "balls" during the second time with Rycraw in the bedroom. In her testimony at trial, Victim testified that Rycraw made her "suck ... [h]is front area" and that her "lips touched it a little bit." Victim's trial testimony was sparse on details in comparison to her CAC interview, which was conducted in a private room with a single interviewer. Defendant argues that the variations in Victim's testimony suggested that Victim identified two separate acts of penis-to-mouth contact. We find this argument unpersuasive.

Importantly, unlike the allegations of hand-to-vagina contact and genital exposure, nothing in the record suggests that evidence was presented to the jury describing multiple,

---

way that caused manifest injustice, Rycraw must only show a "reasonable likelihood" that the jury misapplied the faulty instruction to deprive him of his constitutional right. Erwin, 848 S.W.2d at 483.

distinct events of penis-to-mouth contact; rather, Victim testified at trial to the same individual act that she described in the CAC interview. To the extent that Victim's characterization or description of the act in the CAC interview was inconsistent or conflicting with her testimony at trial, the jury was entitled to reject Victim's testimony. See State v. Kuehnlein, 456 S.W.3d 510, 514 (Mo. App. E.D. 2015). However, our record does not suggest that the State introduced evidence as two "distinct criminal acts" of penis-to-mouth contact. See Celis-Garcia, 344 S.W.3d at 155.

Because the evidence supports the occurrence of only one instance of penis-to-mouth contact, the specific requirement of penis-to-mouth contact in the verdict director prevented the jury from finding Rycraw guilty of Count V for any act not involving penis-to-mouth contact. See Edwards, 365 S.W.3d at 247. Rycraw's right to a unanimous verdict was guaranteed under the verdict director for Count V because the jury could only convict Rycraw of Count V if it unanimously agreed that the single act of penis-to-mouth contact occurred.

In conclusion, we grant Rycraw's point in part. With respect to Instruction Nos. 5, 7, and 9 we find no error. With respect to Instruction No. 6 and 8, we find instructional error that prejudiced Rycraw's constitutional right to a unanimous verdict. Accordingly, we reverse Rycraw's convictions under Counts II and IV for second-degree sexual misconduct.

## Conclusion

The judgment of the trial court is reversed with respect to Counts II and IV. The judgment is affirmed in all other respects. The case is remanded to the trial court for further proceedings consistent with this opinion.

KURT S. ODENWALD, Judge

James M. Dowd, P.J., concurs.
Gary M. Gaertner, Jr., J., concurs.

27