

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | WD81873 |
| v. | ) | |
| | ) | |
| ROBERT L. BROWN, | ) | FILED: March 3, 2020 |
| Appellant. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF JOHNSON COUNTY
### THE HONORABLE WILLIAM B. COLLINS, JUDGE

### BEFORE DIVISION THREE: LISA WHITE HARDWICK, PRESIDING JUDGE,
### ALOK AHUJA AND ANTHONY REX GABBERT, JUDGES

Robert Lee Brown appeals from his convictions for nine counts of first-degree statutory sodomy and two counts of victim tampering. He contends the circuit court plainly erred in instructing the jury on two of the first-degree statutory sodomy counts because the verdict directors violated his right to a unanimous verdict. Brown also argues the court plainly erred in allowing propensity evidence. For reasons explained herein, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

The evidence, in the light most favorable to the verdicts, was that A.E., who was born in July 2006, and K.E., who was born in September 2008, lived with their mother ("Mother") and Brown, who was their stepfather. A.E. lived with Mother and Brown from

March 2017 through April 2017, while K.E. lived with Mother and Brown from September 2016 through April 2017.

A.E. and K.E. were removed from the home in April 2017 after a neighbor reported that the girls were being physically abused and neglected by Mother and Brown.[1] After the girls were placed in foster care, they disclosed to their foster mother that Brown had sexually abused them. Specifically, A.E. told her foster mother that Brown had tried to "put his private inside of her." She described an incident during which Mother had given her four or five ten-milligram melatonin pills, she fell asleep, and when she woke up, Brown was "trying to put it in her bottom." K.E. told her foster mother that Brown would "put lotion on her butt and put his thing in there." K.E. said that, when she would cry or scream, he would put his hand over her mouth and slam her down on the ground until she quit screaming. K.E. also disclosed that Brown "put it in her mouth" in the garage and, after he ejaculated, he threw some towels at her and told her to clean it up. Additionally, K.E. told her foster mother that he molested her in his work truck. K.E. said that Brown told her that if she ever told anyone, she would be sent to a girls' home and he would go to prison. Brown also told her that, when he got out of prison, he would find her and shoot her in the face with a shotgun.

After the girls disclosed the abuse to their foster mother, they spoke to Rebecca Baynum, a Children's Division investigator. A.E. told Baynum that Brown had put his "bad spot inside of her," and she pointed to her vaginal area. K.E. also told Baynum that Brown had put his "bad spot" or "private" in her "bad spot," and she pointed to her

---

[1] In a separate case, the girls' mother pled guilty to child abuse, while Brown was found guilty of child abuse, neglect, and endangering the welfare of a child.

vaginal area. Baynum referred both girls to Mari Asbury, a Child Safe forensic interviewer.

A.E. told Asbury that, when she was in her bedroom, Brown put his "bad spot" in her butt and put his finger in her "bad spot." She also said that Brown pulled down her pants, put his "bad spot" in her "bad spot," and asked her how it felt. A.E. pushed him off of her and tried to leave to tell Mother about what Brown had done. Brown prevented her from leaving, however, and threatened to put gasoline in her water and kill her if she told anyone. Additionally, A.E. told Asbury that, while she and Brown were sitting on the couch, he took her hand and tried to make her touch his "bad spot."

Asbury also interviewed K.E. K.E. told Asbury that Brown put his "bad spot" in her butt several times. She said that the first time it happened, on September 20, 2016, she was asleep in her bed when Brown came into her room. Mother was not home at the time, and K.E. said that he did this to her only when Mother was not home. K.E. said that Brown pulled down her pants and put his "thing" in her "butt." K.E. said that it hurt and that she told Brown to stop, but he put his hand over her mouth and told her to be quiet. K.E. said that Brown "did it" until he "cummed" and then he took "it" out of her "butt," put it in her mouth, "shoved it right down [her] throat, and "cummed" in her mouth. She said that the "cum" was white, gooey, and tasted "disgusting," and she "puked." She later told Asbury that Brown "cummed" only in her mouth that time. K.E. said that, when Mother got home, she wanted to tell Mother what Brown had done, but Brown told her that, after he got out of prison, he would kill her with a shotgun. K.E. said that she had to take a shower to clean up because Brown had "cummed" in her "butt," and she saw blood on her bottom before she got into the shower. K.E. told Asbury that Brown

3

came back later that same night, sat down on her bed, woke her up, and did the same thing, but this time, he "cummed" in her "butt" and not in her mouth.

K.E. also disclosed to Asbury that, two weeks later, Brown put his "bad spot" in her bottom in the garage after pushing her onto van seats that had been taken out of the van and were on the garage floor. She said she could feel it in her stomach and that it hurt "really bad." K.E. said that Brown "cummed all over the place" on the seats, her "butt," and her legs, and told her to clean it up. K.E. further told Asbury that, once, when she was lying down in defendant's bedroom, Brown put his "wiener" in her "butt," "cummed" a little bit in her "butt," and "put the rest of his cum" in her mouth. K.E. said she ran to the bathroom and "puked it out." On other occasion, Brown put his finger in her "butt" in her bedroom. Additionally, K.E. told Asbury that Brown licked the inside her "private" once when she was sleeping in A.E.'s bedroom, which she said "hurt really bad."

The State charged Brown with nine counts of first-degree statutory sodomy. The first seven counts of first-degree statutory sodomy alleged that Brown had deviate sexual intercourse with K.E., a child who was then less than 14 years old, between September 1, 2016, and April 14, 2017. Specifically, Count I alleged that Brown put his penis in K.E.'s anus while in K.E.'s bedroom; Count II alleged that Brown put his penis in K.E.'s anus in his bedroom; Count III alleged that Brown put his penis in K.E.'s mouth while in K.E.'s bedroom; Count IV alleged that Brown put his penis in K.E.'s mouth in his bedroom; Count V alleged that Brown put his penis in K.E.'s anus while in the garage; Count VI alleged that Brown put his penis in K.E.'s anus in the bedroom; and Count VII alleged that Brown put his tongue or mouth on K.E.'s genitalia in K.E.'s sister's

4

bedroom.  The last two counts of first-degree statutory sodomy alleged that Brown had deviate sexual intercourse with A.E., a child who was then less than twelve years old, between March 1, 2017, and April 14, 2017.  Count VIII alleged that Brown put his penis in A.E.'s anus, and Count IX alleged that Brown attempted to cause A.E.'s hand to be on his penis in the living room.  The State also charged Brown with two counts of victim tampering by purposely preventing or dissuading K.E. and A.E. from reporting the first-degree statutory sodomy.

A jury trial was held in March 2018.  Both A.E. and K.E. testified.  A.E. testified that Brown had touched her "boobs," "butt," and vagina with his hands and his penis.  She said that, when she was ten years old, Brown pulled down her pants and his pants and began "humping" her by moving back and forth.  She testified that Brown put his "body parts" in her vagina and "butt."  On one occasion when she and Brown were on the couch, he put her hand on his penis.  A.E. testified that Brown threatened to put gas in her water and kill her if she told anyone.

K.E. testified that Brown "humped" her in her "bad spot" more than one time.  Specifically, she said that, the first time, when Brown came into her bedroom, she was watching a movie, playing on her DSR, or sleeping.  K.E. later testified that she could not remember what she was doing.  She testified that, when Brown came in, he pulled down her pants, put his "bad spot" in her "bum" and was "humping" her.  K.E. testified that he covered her mouth so she would not scream out loud, and he told her that he would "shoot [her] upside the head with the shotgun" if she told anyone.  She said that he did the same thing at other times in A.E.'s room and in Brown's bedroom when Mother was gone.   K.E. further testified that "cum" came out of Brown's "bad spot"

5

when he did this to her, and she described it as being white and gooey. K.E. said that Brown would put the "cum" in either her mouth or her bottom. She said that, when he put it in her mouth, she went to the bathroom and spit it out. K.E. also testified that Brown put his tongue in her "front bad spot" and told her to touch his "front bad spot." Additionally, she testified that Brown "humped" her in the "bum" in the garage when she was bent over on a van seat. When asked if anything came out of Brown's "bad spot" at that time, K.E. said that it did not. K.E. testified that this occurred in the garage only one time. On cross-examination, K.E. testified that she knew the word "cum" because Brown told her what it was and that she had never heard that word before he told her about it.

In addition to A.E.'s and K.E.'s testimony, the State presented testimony from the girls' foster mother, a nurse practitioner to whom K.E. disclosed the sexual abuse during an interview and a police officer who was present during that interview, a Children's Division employee to whom K.E. and A.E. disclosed the physical abuse inflicted by their mother and Brown and to whom K.E. disclosed Brown's sexual abuse, Baynum from the Children's Division, and Asbury from Child Safe. The State also presented testimony from a child abuse pediatrician from Children's Mercy who examined both girls. The pediatrician found that the girls' physical examinations were normal, and she explained that 90 to 95 percent of children who disclose sexual abuse will have normal physical examinations afterwards because the skin in the genital area and rectum is stretchy and heals within days. Based upon A.E.'s and K.E.'s disclosures, the pediatrician diagnosed both A.E. and K.E. with child sexual abuse.

6

Additionally, the State presented propensity evidence from one woman who testified that Brown had forcibly raped her in Kansas in 1995 and another woman who testified that Brown had forcibly raped her in Kansas in 1999. The women did not report the alleged forcible rapes until sometime between 2014 and 2018, and Brown was never charged.

Lastly, the State offered the testimony of Lieutenant Andy Gobber of the Johnson County, Missouri Sheriff's Office, who testified about his investigation of the physical and sexual abuse cases of A.E. and K.E. and also about recordings of phone calls Brown made to his mother and to Mother while he was in jail awaiting trial. In the phone calls to his mother, Brown instructed his mother on what to say if she were called to testify, and he instructed her to talk to other witnesses to tell them what to say in their testimony. In one phone call with Mother, Brown asked her if she knew where her mom was. Mother responded, "All I know is in Kansas." Brown then said, "The one that we visit every now and again when we go up there." When Mother replied, "Yeah," Brown said, "Push comes to shove, there's going to be two more right there to visit, guaranteed, if you get my fucking drift. I ain't putting up with this shit, do you hear me." Mother's mother is deceased and is buried in a cemetery in Kansas. Gobber interpreted Brown's comment as a threat against A.E. and K.E.

The jury convicted Brown on all counts. The court sentenced him to fifteen years in prison on each of the nine counts of first-degree statutory sodomy and seven years for each count of victim tampering. All sentences are to be served consecutively. Brown appeals.

7

In Points I and II, Brown contends the circuit court erred in submitting the verdict directors for two of the first-degree statutory sodomy counts involving K.E. Specifically, Count I, which alleged that Brown put his penis in K.E.'s anus in her bedroom, and Count V, which alleged that Brown put his penis in K.E.'s anus in the garage. He argues that there was evidence of multiple acts pertaining to each count, but the verdict directors failed to specify a particular incident. He asserts that, by failing to specify a particular incident, the instructions did not ensure a unanimous jury verdict. Brown concedes that he failed to object to the instructions at trial. Therefore, review is for plain error only.

Pursuant to Rule 30.20, this court has discretion to review "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "For instructional error to constitute plain error, the defendant must demonstrate the trial court so misdirected or failed to instruct the jury that the error affected the jury's verdict." *State v. Celis-Garcia*, 344 S.W.3d 150, 154 (Mo. banc 2011) (quotation marks and citations omitted).

Article I, section 22(a) of the Missouri Constitution protects the right to a unanimous jury verdict. *Id.* at 155. "For a jury verdict to be unanimous, 'the jurors [must] be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt.'" *Id.* (citations omitted). The issue of jury unanimity may be implicated in "multiple acts" cases. *Id.* "A multiple acts case arises when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a

8

criminal charge, but the defendant is charged with those acts in a single count." *Id.* at 155-56.

In *Celis-Garcia*, the Court held that a defendant's right to a unanimous jury verdict was violated when the verdict directors failed to separately identify specific instances of sodomy. *Id.* at 159. The victims in the case identified "at least seven separate acts of statutory sodomy that occurred at different times (some more than three days apart) and in different locations" within the house in which they lived with their mother, who was the defendant, and her boyfriend. *Id.* at 156. The Court found that, "[d]espite evidence of multiple, separate incidents of statutory sodomy, the verdict directors failed to differentiate between the various acts in a way that ensured the jury unanimously convicted [the defendant] of the same act or acts." *Id.* Instead, the verdict directors (one for each victim) allowed the jury to find the defendant guilty of first-degree statutory sodomy if the jurors believed "'that between [specified dates] . . . the defendant or [her boyfriend] placed her or his hand on [the victim's] genitals. . . .'" *Id.* The Court explained that the verdict directors were erroneous because they allowed a finding of guilt when jurors may not have unanimously agreed on the same specific act of sodomy:

> This broad language allowed each individual juror to determine which incident he or she would consider in finding [the defendant] guilty of statutory sodomy. Under the instructions, the jurors could convict [the defendant] if they found that she engaged or assisted in hand-to-genital contact with the children during an incident in her bedroom, *or* on the enclosed porch, *or* in the shed, *or* in the bathroom.

*Id.*

Applying the principles of *Celis-Garcia* to the instructions in this case, we find that, contrary to Brown's assertion, Count V did not involve multiple acts. "To establish

9

a multiple acts case, there must be evidence of multiple, distinct criminal acts" charged in a single count. *State v. Drake*, 514 S.W.3d 633, 642 (Mo. App. 2017). Count V charged Brown with first-degree statutory sodomy for putting his penis in K.E.'s anus while in the garage. The verdict director for Count V was Instruction No. 11, and it stated, in relevant part:

> As to Count V, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or between September 1, 2016 and April 14, 2017, in the County of Johnson, State of Missouri, the defendant knowingly placed his penis in K.E.'s (DOB: 9/15/08) anus while in the garage, and
>
> Second, that such conduct constituted deviate sexual intercourse, and
>
> Third, that at the time K.E. was a child less than twelve years old,
>
> then you will find the defendant guilty under Count V of statutory sodomy in the first degree under this instruction.

At trial, K.E. testified that Brown "humped" her in the "bum" in the garage when she was bent over on a van seat. When asked if anything came out of Brown's "bad spot" at that time, K.E. said that it did not. K.E. testified that this occurred in the garage only one time. In her Child Safe interview, K.E. told Asbury that Brown put his "bad spot" in her bottom in the garage after pushing her over onto van seats that had been taken out of the van and were on the garage floor. She said that Brown "cummed all over the place" on the seats, her "butt," and her legs, and he told her to clean it up.

Brown contends that the evidence shows that two distinct acts of penis-to-anus sodomy occurred in the garage: one act during which he did not ejaculate and another act during which he ejaculated on the van seat and on K.E.'s bottom and legs. We disagree. In both her trial testimony and in her Child Safe interview, K.E. described only

10

one act of penis-to-anus sodomy as having taken place in the garage. To the extent that her descriptions of that one act were inconsistent on the issue of whether Brown ejaculated or not, the inconsistency went to her credibility. *See State v. Rycraw*, 507 S.W.3d 47, 64-65 (Mo. App. 2016). The inconsistency in this detail "does not suggest that the State introduced evidence as [to] two 'distinct criminal acts'" of penis-to-anus contact, particularly in light of K.E.'s testimony at trial that this act occurred only one time in the garage. *Id.* The evidence was – at best – ambiguous as to whether multiple acts occurred or, instead, whether K.E. had simply described a single act in somewhat different ways at different times. In these circumstances, and particularly where the defendant has not made a contemporaneous objection and requested specific relief, a circuit court runs a real risk of confusing jurors if it instructs them that multiple acts have in fact occurred, and that they must choose among those multiple acts in order to convict the defendant. Brown's right to a unanimous verdict on Count V was not violated.

Regarding Count I, first-degree statutory sodomy based upon Brown's placing his penis in K.E.'s anus in her bedroom, the verdict director for this offense was Instruction No. 7. It stated, in relevant part:

> As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or between September 1, 2016 and April 14, 2017, in the County of Johnson, State of Missouri, the defendant knowingly placed his penis in K.E.'s (DOB: 9/15/08) anus while in K.E.'s bedroom, and
>
> Second, that such conduct constituted deviate sexual intercourse, and
>
> Third, that at the time K.E. was a child less than twelve years old,

11

then you will find the defendant guilty under Count I of statutory sodomy in the first degree under this instruction.

Brown first argues that K.E.'s trial testimony about what she was doing the first time he committed anal sodomy on her in her bedroom actually described two separate acts of anal sodomy. Specifically, he asserts that she testified to one act as having occurred when she was watching a movie and another act as having occurred when she was playing on her DSR. We disagree. When asked what she was doing when Brown came to her bedroom that first time, K.E. testified that she was watching a movie, playing on her DSR, or sleeping, but she could not remember. K.E.'s testimony that she could not remember which of those things she was doing the first time Brown sodomized her in her bedroom cannot be read as describing distinct, differentiated incidents of anal sodomy that occurred (1) while she was watching a movie, (2) while she was playing on her DSR, and (3) while she was sleeping. Instead, her inability to remember what she was doing the first time he anally sodomized her went only to her credibility and did not constitute multiple acts evidence. *See Rycraw*, 507 S.W.3d at 64-65.

Brown next argues that the State presented evidence of two separate acts of anal sodomy that occurred in K.E.'s bedroom. Specifically, he contends that K.E. described one incident of anal sodomy where he ejaculated in her mouth and a second incident of anal sodomy where he ejaculated in her anus.

At trial, K.E. testified about only one specific incident of anal sodomy on the night that he first anally sodomized her in her bedroom, and she did not testify about where he ejaculated during that incident. In her Child Safe interview, K.E. told Asbury that, on the night that Brown first anally sodomized her in her bedroom, he "did it" until he

12

"cummed," and then he took "it" out of her "butt," put it in her mouth, and "cummed" in her mouth. She later told Asbury that Brown "cummed" only in her mouth that time. K.E. said that Brown came back to her bedroom later that night, woke her up, and did the same thing, but his time, he "cummed" in her "butt" and not her mouth. K.E. told Asbury that, in between the incident during which he ejaculated in her mouth and the incident during which he ejaculated in her anus, Mother came home, and K.E. took a shower and went to bed. She also told Asbury, though, that one of the reasons she had to take a shower *before* she went to bed was because she had to clean herself up after Brown had "cummed" in her "butt." Moreover, K.E. twice told Asbury that Brown sexually abused her only when Mother was not home, which would tend to indicate that the incident of anal sodomy during which he ejaculated in her anus occurred at or near the same time during which he ejaculated in her mouth, before Mother got home.

K.E.'s trial testimony and her Child Safe interview about the first time that Brown anally sodomized her in her bedroom could be interpreted as describing one incident during which he ejaculated in both her anus and her mouth. Indeed, she testified at trial to only a single incident of anal sodomy on that night, and her statements concerning the reason for and timing of her shower that night and where Mother was suggested that it was all one incident. Thus, to the extent that K.E.'s characterization or description of the incident during her Child Safe interview was inconsistent, the inconsistency would go to her credibility and would not constitute multiple acts evidence. *See id.* Again, in these circumstances and without a contemporaneous objection and request for specific relief by the defendant, the circuit court runs the risk of

13

confusing the jury if it instructs them that multiple acts have in fact occurred, and that they must choose among those multiple acts in order to convict the defendant.

Even if the evidence could be interpreted as describing two acts of anal sodomy that occurred within hours of each other in K.E.'s bedroom that first night, however, those acts fall within a hypothetical recognized in *Celis-Garcia*. While the evidence for each victim in *Celis-Garcia* showed that multiple acts of sodomy occurred at different, specified locations over an extended time period, the Court recognized that a case in which the victim reported repeated, identical acts of sexual abuse occurring in the same location over a short time span might prompt a different result:

> The state argues that requiring the state to differentiate between multiple acts would make it impossible to prosecute sexual abuse cases involving repeated, identical sexual acts committed at the same location and during a short time span because the victim would be unable to distinguish sufficiently among the acts. *The case hypothesized by the state was not the one presented here because both [victims] provided details of multiple sexual acts that were committed at different times and in different locations.*

*Celis-Garcia*, 344 S.W.3d at 157 n.8 (emphasis added). Like the acts referenced in the hypothetical, the two acts of anal sodomy that occurred within hours of each other in K.E.'s bedroom on that first night were repeated, identical sexual acts committed at the same location during a very short time span. K.E.'s testimony and her Child Safe interview indicate that she was unable to sufficiently distinguish between the two acts. Consequently, the jury had no evidentiary basis for distinguishing between them. Brown's right to a unanimous verdict on Count I was not violated. Points I and II are denied.

In Point III, Brown contends the circuit court erred in allowing the State to introduce evidence of his sexual misconduct against two prior victims, S.M. and A.S.

14

He argues that this propensity evidence was improperly admitted because it was substantially more prejudicial than probative.

Prior to trial, the State filed a notice of its intent to present propensity evidence pursuant to article I, section 18(c) of the Missouri Constitution. Specifically, the State alleged that it intended to offer evidence that Brown forcibly raped A.S. when she was approximately twelve years old and raped S.M. when she was approximately ten years old. In response, Brown filed a motion *in limine* to exclude this evidence.

The court held a pre-trial evidentiary hearing on the State's proposed propensity evidence. During the hearing, the State offered the testimony of Terry Mills, a detective with the Linn County, Kansas Sheriff's Office. Mills testified that he had investigated Brown on two charges of rape. Mills testified that A.S., born in October 1983, had reported to him that, in 1995, when she was twelve years old, Brown came over to the house to check on her and her brother because her parents were working at that time. A.S. told Mills that, after her brother went to bed, Brown came into her room, touched her, felt her leg, and kissed her before he held her hands down and forcibly raped her. Brown threatened A.S. and her family if she ever told anyone. A.S. told Mills that, after that incident, she withdrew and "didn't want to really go out or go anywhere." Mills also testified that S.M., born in November 1989, had reported to him that, in 1999, when she was ten years old, she was babysitting Brown's children when Brown started touching her inappropriately, telling her that he loved her, and, eventually, forcibly raping her. Brown continued to rape her multiple times over the course of a year. Brown threatened S.M. not to tell anyone. On cross-examination, Mills testified that A.S.'s and

S.M.'s reports to him about Brown were made between 2014 and 2018 and that no criminal charges in connection with either case were ever filed against Brown.

The State also offered the testimony of Lieutenant Gobber during the pre-trial evidentiary hearing. Gobber testified that, as part of his investigation of the charges in the present case, he was contacted by S.M. S.M. told Gobber that Brown was one of her parents' friends and that, when she was ten years old and was babysitting Brown's kids, he raped her. S.M. told Gobber that Brown also kissed her, fondled her breasts, touched her butt, and touched her vagina. S.M. said that it happened more than one time and in multiple locations.

After hearing arguments from both parties, the court found that the State's propensity evidence was probative and ruled that it would allow the testimony of the two alleged victims in the Linn County cases. The court told the parties that it "should hear some of [A.S.'s and S.M.'s] testimony outside of the hearing of the jury . . . prior to them coming in and testifying at trial with regard to some of those issues." However, the record does not indicate that the court heard A.S.'s or S.M.'s testimony before they testified in front of the jury. Brown did not object to their testimony.

A.S. testified that, when she was twelve or thirteen years old in approximately 1995, Brown, who was a family member on her father's side, came to her house around 9:00 p.m. and told her and her brother that their parents had sent him to check on them. After A.S.'s brother went to bed, Brown came into her room, told her how pretty she was, rubbed her legs and arms, and kissed her. She testified that she kept telling him no, but he pushed her back on the bed and "stuck his penis inside [her]." A.S. further testified:

16

> The more I was trying to fight, the more aggressive he got, locked his legs with mine, pushed my arms down and the more I was fighting, the more he kept shoving inside me, the more he kept holding me down. I couldn't move. My brain just shut off, I was just frozen, I was scared, I was confused, I didn't know what was going on.

A.S. testified that she did not tell anyone at the time because Brown threatened to hurt her. When the State asked A.S. whether her life changed after what happened with Brown, A.S. testified that she "pushed everybody out of [her] life," "had attitude problems," and dropped out of school in the ninth grade. A.S. further explained that her life did not improve until fourteen years ago when she met her husband, but, even then, she was depressed, angry, and unable to "perform with him." A.S. testified that she reported the incident to the police in July 2015, but Brown was never arrested or charged.

S.M. testified that, in the 1990s, Brown spent a lot of time with her family because he was one of her father's friends. In approximately 1999, when she was ten years old, Brown started telling her "nice things like [she] was beautiful and stuff and then it just kind of escalated from there to touching and then eventually it went to rape." S.M. testified that she repeatedly told him to stop, but he touched her inappropriately and raped her more than one time over the course of two years in multiple locations. Brown told her that he was her boyfriend, and he would buy her things. S.M. testified that she did not tell anyone what Brown was doing because she was afraid and confused, and she explained why:

> At first I was afraid. I was confused and then once he told me that there was a girl that he – I don't know what happened – there was someone else before me and she had told something and he said that she had to have tests done on her where they would go inside of you and it hurt really bad, and so that scared me. I didn't want that to happen to me.

17

Brown also told her that she was supposed to marry him and that, if she told anyone about the alleged abuse, she would be in just as much trouble as he would be.

When S.M. was twenty years old, she told her sister about the alleged abuse. When S.M. was twenty-five years old, S.M.'s sister told their parents, and their parents suggested that S.M. report it to the police. S.M. said the reason she did not tell her parents sooner was because she was afraid that her father would hurt Brown and then she "wouldn't have [her] dad anymore." S.M. testified that Brown was never arrested or charged for any offenses involving her.

When the court read its instructions to the jury after the close of the evidence, it gave the following limiting instruction on the propensity evidence:

> If you find and believe from the evidence that the defendant was involved in offenses other than the one for which he is now on trial, you may consider that evidence on the issue of propensity to commit the charged offense of statutory sodomy in the first degree. You may not consider such evidence for any other purpose.

Both the State and Brown referred to the propensity evidence in closing argument. In his motion for new trial, Brown asserted that the admission of the propensity evidence was logically and legally irrelevant and did not constitute true propensity evidence.

"To preserve an issue of evidentiary error, an objection must be made at a time contemporaneous to the challenged evidence." *State v. Wright*, 551 S.W.3d 608, 621 (Mo. App. 2018). "A 'motion in limine, in and of itself, preserves nothing for appeal.'" *State v. Blurton*, 484 S.W.3d 758, 776 (Mo. banc 2016) (citation omitted). Because Brown failed to preserve his challenge to the admissibility of the propensity evidence by not objecting when it was introduced at trial, we review its admission for plain error.

18

Under plain error review, we must first determine "whether there is error that is 'evident, obvious, and clear.'" *State v. Deweese*, 540 S.W.3d 490, 493 (Mo. App. 2018) (citation omitted). If we find evident, obvious, and clear error, we then consider "whether a manifest injustice or miscarriage of justice has occurred." *Id.*

The propensity evidence was admitted under article I, section 18(c) of the Missouri Constitution. This provision, which the voters of Missouri added to the Constitution in 2014, states:

> Notwithstanding the provisions of sections 17 and 18(a) of this article to the contrary, in prosecutions for crimes of a sexual nature involving a victim under eighteen years of age, relevant evidence of prior criminal acts, whether charged or uncharged, is admissible for the purpose of corroborating the victim's testimony or demonstrating the defendant's propensity to commit the crime with which he or she is presently charged. The court may exclude relevant evidence of prior criminal acts if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

MO. CONST. art. I, § 18(c).

Our Supreme Court discussed several factors to consider in analyzing whether propensity evidence is admissible under this constitutional amendment in *State v. Williams*, 548 S.W.3d 275 (Mo. banc 2018). Before undertaking its analysis in *Williams*, the Court noted that the admissibility of propensity evidence is very case specific, explaining, "The determination of how much and what kind of probative value particular propensity evidence may have, the nature and extent of the danger of unfair prejudice presented by that evidence, and whether the former is substantially outweighed by the latter, are intensely case-specific questions." *Id.* at 288. The Court further explained that "[t]he relevant factors to be considered in deciding these questions will vary from case to case, as will the weight to be afforded any one factor in particular." *Id.* Thus,

19

the Court cautioned that "the factors set forth in this opinion, and the weight given to those factors, are merely illustrative of the legal relevance analysis article I, section 18(c) requires." *Id.*

The first step in analyzing the admissibility of propensity evidence is to examine its logical relevance or probative value. In doing so, courts consider whether the evidence is "sufficient for the jury to conclude the defendant actually committed the prior criminal act." *Id.* In *Williams*, the defendant had pled guilty to the prior offenses, which "remov[ed] any doubt as to whether he had committed the criminal act." *Id.* at 289.

In this case, Brown was never charged with or convicted of any offenses against A.S. or S.M. Article I, section 18(c), however, clearly allows for the admission of evidence of *uncharged* prior criminal acts. A.S.'s and S.M.'s testimony about the acts of sexual abuse that Brown committed against them was specific, unequivocal, and sufficient for the jury to conclude that he actually committed the acts alleged. This factor indicates that the propensity evidence had probative value.

In examining probative value, courts also consider whether "the evidence of the prior criminal act . . . tend[s] to show the defendant actually had a propensity to commit the charged crime at the time it is alleged to have occurred." *Id.* In applying this factor, we take into account the "the similarity between the prior criminal act and the charged crime" and the "amount of time between the two." *Id.* "[A]n inference of propensity might be proper notwithstanding a significant time lapse between the prior crime and the charged crime if the two crimes are highly similar." *Id.* "On the other hand, an inference of propensity might not be proper if the prior crime and the charged crime are only somewhat similar unless the two occurred over a short span of time." *Id.*

20

Here, while there was a significant time lapse of seventeen years and twenty-one years between the prior uncharged criminal acts and the charged crimes, the prior uncharged criminal acts and charged crimes were very similar. The prior uncharged criminal acts involved girls between the ages of ten and thirteen years old, one who was related to Brown and the other who was a close family friend, and Brown threatened to hurt one of them, A.S., if she told anyone about the abuse. The victims in the charged crimes were eight and ten years old, were Brown's stepdaughters, and reported that Brown inflicted similar sexual abuse upon them and threatened to hurt them if they told anyone about the abuse. This factor indicates that the propensity evidence had probative value.

Additionally, courts look to "the prosecution's need for that evidence to prove its case" in deciding whether the proposed propensity evidence has probative value. *Id*. "Prior acts evidence need not be *absolutely necessary* to the prosecution's case in order to be introduced; it must simply be helpful or *practically necessary*." *Id*. (quoting *United States v. LeMay*, 260 F.3d 1018, 1029 (9th Cir. 2001)). The probative value of propensity evidence is enhanced where the only eyewitness to the sexual abuse is the victim, and the defense attacks the victim's credibility. *Id*. at 290.

The State's need for the propensity evidence in this case was substantial because the only eyewitnesses to Brown's sexual abuse were A.E. and K.E. *See id*. The other witnesses only indirectly corroborated their testimony. *See id*. Moreover, Brown's defense at trial was that A.E. and K.E. were lying and fabricated the allegations. Thus, here, as in *Williams*, "[t]he unique evidentiary challenges presented

21

by this type of case," along with the defense's attack on the victims' credibility, "enhanced the probative value" of Brown's prior uncharged criminal acts evidence. *Id.*

Having found that the propensity evidence in this case had probative value, the second step in analyzing the admissibility of propensity evidence is to examine whether the evidence was unfairly prejudicial. *Id.* On this issue, courts consider "whether the jury knows or can fairly infer the defendant was punished for his past criminal acts." *Id.* "If the jury is allowed to infer (or, worse, speculate) the defendant escaped punishment in the past, it may be inclined to convict merely to punish the defendant for past criminal acts rather than for the crime charged." *Id.*

In this case, the jury clearly knew that Brown was not punished for his prior uncharged criminal acts against A.S. and S.M. While it is true that Brown used the fact that he was never charged or convicted to argue that the propensity witnesses were not credible, the evidence showed that the reason Brown was never charged or convicted was because A.S. and S.M. waited a substantial number of years, until they were adults, before they disclosed the abuse and reported it to police. A.S. testified that the reason she did not tell anyone about the abuse at the time it happened was because Brown threatened to hurt her. S.M. testified that she told no one about the abuse at the time it happened because she was afraid, confused, and scared, as Brown had told her that, if she told, she would have to have "tests done . . . where they would go inside of you and it hurt really bad," and she did not want that to happen to her. S.M. also testified that another reason she did not tell her parents earlier was because she was afraid that her dad would "hurt [Brown] and then [she] wouldn't have [her] dad anymore." Based upon this evidence, the jury could have inferred that Brown scared or

22

manipulated A.S. and S.M. into staying silent long enough for him to escape punishment. Under these circumstances, there was an increased risk that the jury might have been inclined to convict Brown to punish him for his past uncharged criminal acts rather than for the crimes charged.

Unfair prejudice may also "be a function of the manner in which the state proves the prior criminal act at trial." *Id.* In *Williams*, the Court explained that, if the circuit court had allowed the State to prove the prior crime by calling the former victim to describe the abuse, "[s]uch testimony, of course, would have increased the danger of unfair prejudice." *Id.* Because the defense and the State in *Williams* "agreed to prove Williams's prior criminal act by way of a short, dispassionate stipulation," the Court found that this danger was "minimized." *Id.*

Here, the court allowed the State to prove the prior uncharged criminal acts by calling A.S. and S.M. to testify about the sexual abuse Brown inflicted upon them. Though brief, A.S.'s testimony about the forcible rape was graphic. Also, A.S. testified in detail about how Brown's forcibly raping her when she was twelve or thirteen years old negatively impacted her life. She told the jury that, at the time, it caused her to push "everybody" out of her life, have attitude problems, and drop out of school; years later, it caused her to be depressed, angry, and unable to "perform" with her husband.[2] S.M.'s testimony about Brown's inappropriately touching her and raping her over the course of two years starting when she was ten years old was less graphic than A.S.'s testimony, but she did detail how Brown groomed her before and while he was abusing her. S.M.

---

[2] Brown argues that the danger of unfair prejudice was increased because A.S. cried during her testimony. Although defense counsel argued in closing that A.S. was "crying uncontrollably on direct examination," defense counsel did not make a record during or after A.S.'s testimony about her alleged demeanor while she was testifying.

23

also referred to a possible third prior victim. Specifically, S.M. testified that, when Brown was convincing her not to report the abuse, he told her that "there was someone else before me and she had told something and he said that she had to have tests done on her where they would go inside of you and it hurt really bad, and so that scared me. I didn't want that to happen to me." Unlike the propensity evidence in *Williams*, the propensity evidence in this case was graphic in part, overly detailed, and not dispassionate. This increased the danger of unfair prejudice.

The next factor to consider in examining prejudice is "whether the evidence of the defendant's prior criminal act eclipses—or is overshadowed by—the evidence of the charged crime." *Id*. "Evidence the defendant previously sexually abused a young child is highly prejudicial in the abstract, but there is far less danger of unfair prejudice from such evidence in a prosecution for sexually molesting a young child than there would be in a prosecution for a less heinous crime." *Id*. In *Williams*, the evidence of Williams's prior criminal act, which was introduced by way of "a short, dispassionate stipulation," was "far less alarming than the evidence of the charged crimes," which included graphic testimony from the victim of the sex acts he forced her to perform and the threats he made against her if she told anyone. *Id*. at 290-91.

In this case, the evidence of the uncharged prior crimes was disturbing, but the evidence of the charged crimes was even more so. In their Child Safe interviews and trial testimony, A.E. and, particularly, K.E., described in graphic detail the multiple acts of anal, oral, and hand-to-genital sodomy that Brown performed on them. Additionally, as in *Williams*, the jury also heard other evidence that put Brown in a bad light. *Id*. at 291. For example, the jury was informed that Brown had recently been convicted of

24

child abuse, neglect, and endangering the welfare of a child for beating A.E. and K.E. and padlocking them in their bedrooms for hours. The jury was also informed that Brown threatened to kill A.E. by putting gas in her water, threatened to kill K.E. by shooting her in the face with a shotgun, and made a thinly-veiled threat against the girls' lives during his recorded jailhouse phone conversation with Mother. While the propensity evidence from A.S. and S.M. was graphic in part, overly detailed, and was not dispassionate, we cannot say that it eclipsed or was more alarming than the evidence of the charged crimes involving A.E. and K.E.

Lastly, in examining the prejudicial effect of propensity evidence, courts consider the manner in which the State used the propensity evidence at trial. *Id.* "If the prosecution spends an undue amount of time emphasizing the prior criminal act or flagrantly invites the jury to convict the defendant because he is a 'bad' or 'wicked' man rather than because he committed the crime charged, the danger of unfair prejudice from that evidence quickly becomes untenable." *Id.* If, however, "the prosecution spends relatively little time on the issue of a defendant's prior crimes and merely uses the evidence for its proper purpose (namely, to suggest the defendant has a propensity to commit the charged crime), the danger decreases and may—on balance—not be unfair." *Id.*

Brown argues that the way the State used the propensity evidence exacerbated its prejudicial effect. Specifically, Brown asserts that the State "emphasized" propensity during its opening statement and closing argument. During its opening statement, the State advised the jury, "You will hear evidence about the defendant's propensity to commit these very same offenses. You will hear evidence of the defendant's propensity

25

to commit sex offenses against other young girls." We do not find that this emphasized the propensity evidence.

As for the State's references to the propensity evidence in its closing argument, after discussing the evidence supporting the current charges, the State reminded the jury about the propensity evidence:

> Additionally, you heard from [A.S.] and [S.M.] about [Brown]'s propensity to sexually abuse children, to sexually abuse girls between the ages of 8 and 12. In Missouri, if you find and believe from the evidence that the defendant was involved in offenses other than the ones for which he is now on trial, being nine counts of statutory sodomy in the first degree, you may consider the other offenses he has committed on the issue of propensity to commit the statutory sodomy in the first degree.
>
> You may not consider such evidence for any other purpose, and there is an instruction on that. You look at his propensity and you heard it. He has a propensity to sodomize children.

In this argument, the State basically paraphrased the limiting instruction on the propensity evidence. This was a correct statement of the law, and we do not find that the State unduly emphasized the propensity evidence in its initial closing argument.

Brown also referenced the propensity evidence in his closing argument. After he argued that the victims' testimony in the current case was not credible, he addressed the propensity witnesses:

> Then we have the issue of the propensity witnesses. [A.S.], who was crying uncontrollably on direct examination, and as soon as I stepped up to the podium, the tears magically shut off. Then we had [S.M.].
>
> Here's the thing though, folks, the State of Missouri did not accuse or charge Robert Brown with any crimes related to [A.S.] or [S.M.]. That's smoke and mirrors by the State. Their case is so weak that they have to bring in two people that say that Robert Brown sexually assaulted them 20 years ago to try to convince you 12 people that, well, if he did it to these girls, he must have done it to these girls, too. Please remember, whatever those girls said did not result in Robert Brown getting convicted, charged with those crimes, convicted of those crimes, so how credible can they be

26

that they tell their stories to law enforcement in whatever jurisdiction that this allegedly happened?  No charges, no arrests, no convictions.  Smoke and mirrors, that's all that is.  All that is.

After Brown challenged A.S.'s and S.M.'s credibility in his closing by arguing that the lack of charges or convictions for those alleged acts rendered their testimony incredible, the State responded in rebuttal by noting that the State of Missouri could not charge Brown for crimes committed in Kansas.  This was proper rebuttal to Brown's attack on A.S.'s and S.M.'s credibility.

The State, however, then used the propensity evidence to refer to Brown five times as a "pedophile," arguing to the jury:

I have no power to charge him for what he did to [A.S.] and to [S.M.], or I would have.  But it goes to show a *pedophile's* propensity to commit crimes against children, and that is what he is and what he did.

I have done my job.  I have shown you beyond a reasonable doubt that he is a *pedophile*, that he sodomized these children, and he has a propensity to do that.

. . . .

And ladies and gentlemen, you also heard this *pedophile* talk about these girls as if they mean nothing.

. . . .

You heard beyond a reasonable I have proven that *pedophile* guilty of nine counts of statutory sodomy in the first degree.  And I have proven that *pedophile* guilty of tampering, two counts, one for each victim.  Go back there and find him guilty.

(Emphasis added.)

There was no evidence at trial that Brown had ever been diagnosed as being a pedophile; thus, the State's characterization of him as a "pedophile" appeared to be based upon the propensity evidence.  The State's repeated references to Brown as a

27

"pedophile," and particularly the State's urging the jury to find "that pedophile" guilty, emphasized the propensity evidence and invited the jury to convict Brown because he is a bad or wicked man, thereby increasing the danger of unfair prejudice in this case. *See id.*

Weighing the probative value of the propensity evidence versus the danger of unfair prejudice in this case, the probative value of the propensity evidence was high, as A.S.'s and S.M.'s testimony about the prior uncharged criminal acts was unequivocal, the prior uncharged criminal acts were similar to the charged crimes, and the State's need for the propensity evidence was substantial due to Brown's attacks on A.E.'s and K.E.'s credibility. The danger of unfair prejudice was also high, however. The jury knew Brown had escaped punishment for his prior uncharged criminal acts and may have been inclined to convict him merely to punish him for those acts. Moreover, A.S.'s and S.M.'s testimony went beyond recounting the prior uncharged criminal acts. A.S. graphically described the forcible rape and the many ways in which her life was negatively impacted by it years later, while S.M. detailed how Brown groomed her, and she referenced a third prior victim. The State then exacerbated the risk of unfair prejudice by using the propensity evidence in closing argument to essentially invite the jury to convict Brown because he is a "pedophile." Under these circumstances, the probative value of the propensity evidence was substantially outweighed by the danger of unfair prejudice resulting from the inflammatory manner in which the State presented the evidence at trial and used the evidence in its rebuttal closing argument. Its admission was evident, obvious, and clear error.

28

Having found that the admission of the propensity evidence was plain error, we must next determine whether a manifest injustice of miscarriage of justice has occurred. A manifest injustice or miscarriage of justice does not result from the admission of evidence "when the record demonstrates there was other overwhelming evidence of the defendant's guilt that he does not challenge or which was admissible." *State v. Bowens*, 550 S.W.3d 84, 96 (Mo. App. 2018).

In assessing whether a manifest injustice or miscarriage of justice has occurred, we emphasize that the circuit court would have been entitled, in its discretion, to introduce *some* evidence of Brown's rapes of A.S. and S.M. as propensity evidence under article I, section 18(c). The difficulty in this case is the *other* evidence that was admitted, beyond the fact of the prior rapes themselves: the victims' graphic and emotional descriptions of the manner in which the prior rapes occurred; the fact that Brown was never prosecuted or punished for those prior rapes; and the ongoing adverse effects on the victims arising from the rapes. The other difficulty is the manner in which the State *argued* the prior uncharged rapes to the jury. Thus, in assessing whether a manifest injustice or miscarriage of justice occurred, it is not the admission of evidence of the prior rapes themselves that is relevant. Instead, our focus must be on the prejudicial effect of the evidence of the surrounding circumstances, and the prejudicial effect of the State's rebuttal closing argument.

The other evidence of Brown's guilt was A.E.'s and K.E.'s trial testimony and Child Safe interviews about Brown's abuse and threats, the testimony of all of the persons to whom A.E. and K.E. disclosed Brown's abuse and threats, and the testimony of the Children's Mercy pediatrician who diagnosed them with child sexual abuse.

29

While A.E. and K.E. may have been inconsistent in describing some of the details surrounding the sexual acts, they were clear in describing the actual sexual acts that Brown committed. The actual sexual acts that A.E. and K.E. described supported each of the nine counts of first-degree statutory sodomy against Brown. Furthermore, K.E.'s description of those sexual acts demonstrated a knowledge of sexual matters well beyond that of a typical eight-year-old child. K.E. said that Brown "cummed" in her anus and her mouth and that the "cum" was white, gooey, and tasted disgusting. Defense counsel elicited from K.E. that Brown had taught her the word "cum"; thus, the jury could reasonably infer that Brown was the source of all of her precocious sexual knowledge, including the color, consistency, and taste of ejaculate. Additionally, Brown's conduct after he was arrested evidenced his consciousness of guilt and his desire to conceal the offense. *State v. Barton*, 998 S.W.2d 19, 28 (Mo. App. 1999). In his recorded jailhouse conversations, Brown instructed his mother on what she and other witnesses should say if they were called to testify, and he made a thinly-veiled threat against A.E.'s and K.E.'s lives in his conversation with Mother.

Brown does not challenge the admissibility or sufficiency of *any* of this evidence. This evidence overwhelmingly established his guilt of the charged crimes. "[P]lain error can serve as the basis for granting a new trial on direct appeal only if the error was outcome determinative." *Deck v. State*, 68 S.W.3d 418, 427 (Mo. banc 2002). It is Brown's burden to show that the plain error was outcome determinative, and he has failed to meet that burden. *State v. Wood*, 580 S.W.3d 566, 579 (Mo. banc 2019). Therefore, Brown has not demonstrated that he suffered a manifest injustice or miscarriage of justice entitling him to relief. Point III is denied.

## CONCLUSION

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR